Janet L. HARDEN and James M. Harden, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 80–7425.

United States Court of Appeals, Fifth Circuit.*
Unit B

Oct. 15, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Burnside & Wall, Thomas R. Burnside, Jr., James B. Wall, Augusta, Ga., for plaintiffs-appellants.

Wm. T. Moore, Jr., U.S. Atty., Kenneth C. Etheridge, Melissa S. Mundell, Asst. U.S. Attys., Savannah, Ga., for defendant-appellee.

Before GODBOLD, Chief Judge, JOHNSON and ANDERSON, Circuit Judges.

GODBOLD, Chief Judge:

This tort action, authorized by the Federal Tort Claims Act, 28 U.S.C.A. § 2674, was brought against the United States under Ga. Code § 105–1307 (1976) (current version at Ga. Code Ann. § 74–108), for wrongful death of Clay Harden, 15 year old son of plaintiffs Janet L. and James Harden. After a non-jury trial the district court found that the agent of the government was negligent, and that Clay Harden was negligent, and his negligence a proximate cause, to the extent of 25%. He entered judgment for plaintiffs for $67,586.91, plus interest at 7% from date of judgment. Plaintiffs appeal.

Following are the facts as found by the district court and as supported by the evidence. Clay and 12 or 15 other boys went to a campsite area on United States government property in rural Georgia to initiate Clay and other new members into a so-called fraternity. They paid a fee for the use of campsite 12. Clay and others drank beer they had brought, but Clay was not intoxicated.

The objects of the fraternity were hazing and "hell-raising." Part of the initiation rite was for the initiates to "streak," or run naked in public, on this occasion through other campsites. Those to be initiated stripped naked and were doused with eggs, flour, catsup, and other foods, plus dirt. Members shepherded them toward other occupied campsites. The group, proceeding at a walk and with much noise and shouted profanity, were disorganized, rowdy, and boisterous. Some of the initiates "streaked" through family campsites. Other campers, particularly women, were terrified. Two men heard the commotion, returned to their campsites, and found their wives crouching behind a camper in which they had locked their children for protection. Other campsites were similarly terrorized. At least one shot was fired from an unknown source.

Some person drove from a neighboring campsite and sought assistance from Paul Strang, a ranger who worked only during

peak recreation periods. This person told Ranger Strang to go to the campsite area, that there was about to be "a head-knocking contest" down there. Strang went to the area indicated and found a group of campers—men, women and children—excited and agitated and some armed. They told him what had occurred.

The group of initiates had scattered after leaving this area. They shouted obscenities and terrorized campers at another site. The group then began to move in a disorderly but somewhat quieter manner back toward campsite 12. A shot was fired from a truck with an unknown occupant.

For the purpose of searching for the boys, Strang left the campsite area to which he had first gone. As he approached campsite 12 he heard the shot fired from the truck. Some girls had arrived on the scene, and he asked them if there was any trouble and was told there was not. As he drove slowly away along the road he saw, at his left front, two naked boys approaching him, and several other naked males emerging from the woods on his right. He put his flashlight beam on the boys and called to them to halt but received no response. Strang was excited and fearful. He did not know the age or the purpose of the naked boys. He thrust his gun out the window, holding it almost straight up, intending to fire a warning shot in the air. His truck stalled, his body lurched, his gun hand came in contact with the rear view mirror, and these events, combined with his nervousness, caused him to inadvertently discharge the pistol. The bullet struck Clay, one of the two boys on his left, and killed him.

### I. Clay's negligence

The district court found the government had negligently maintained the truck that stalled and found Ranger Strang negligent. *Harden v. U.S.*, 485 F.Supp. 380, 389–91 (S.D. Ga. 1980). These findings are not contested. It found Clay guilty of comparative negligence that proximately contributed to his death to the extent of 25 percent and reduced the gross damages accordingly. The findings of the district court on Clay's negligence were:

Wesley Clayton Harden also failed to exercise ordinary care or diligence. First, he did not heed the command of Ranger Paul Strang when Strang directed him to halt. At that time, Strang was in uniform in a marked vehicle, and had all of the visual appearances of a duly authorized law enforcement officer. Second, he willingly and actively participated in an indecent public exposure of himself, a disturbance of the peace, and a sequence of events which he knew, or should have known, would cause fear, excitement, and resentment among other persons lawfully within the Ridge Road Campsite Area. Third, Harden accompanied others whom he knew to be engaged in illegal and opprobrious activities. He knew that shots had been fired during their activities. He knew or should have known that exposure, offensive language, and the conduct of the group would cause fear, excitement, resentment, and possibly irrational defensive measures from other persons lawfully in the Ridge Road Campsite Area. Harden owed a duty to the public, and to other users of the campsite area, to refrain from illegal, criminal, opprobrious, or indecent behavior.

485 F.Supp. at 388. (Footnotes omitted).

■ The trial court did not err in finding Clay guilty of negligence that proximately contributed to his injury. Strang told the boys to halt. Clay's companion saw the ranger insignia on the side of the truck. The "streaking" at the family campsite had ended, but the boys had not yet reached the campsite they had rented. The conduct of the group had been such that it was likely to, if not intended to, cause alarm among others in the area. The group had precipitated an uproar at campsites in two or three areas sufficient to cause someone to seek ranger assistance. In the uproar two shots were fired. Women, fearful of safety, locked their children in a camper and hid behind it. When Strang arrived people were agitated and some armed. After the boys left the first campsite area they terrorized one or two more campsites. When

the encounter came with the ranger, Clay was walking the road, still naked, with other initiates. The district court could properly find that Clay was negligent. The contention that as a matter of law Clay could not be found negligent is patently untenable. Whether the dangerous situation—that Clay had helped to create—had terminated was a question for the finder of fact. Certainly it had not as a matter of law come to an end.

The district court was not plainly erroneous in finding that Clay's negligence was a proximate cause of his death. The intervening act of the ranger in shooting the gun did not break the chain of causation as a matter of law. *See William v. Grier,* 196 Ga. 327, 26 S.E.2d 698, 699 (1943) (intervening act of a third person does not break causal connection if act could have been reasonably anticipated); *Medi-Clean Services, Inc. v. Hill,* 144 Ga.App. 389, 241 S.E.2d 290, 293 (1977); *Seago Mechanical Contracting Co., Inc. v. Mobile Homes,* 128 Ga. App. 261, 196 S.E.2d 346, 349 (1973). As the trial court pointed out, Clay had helped to create the situation of danger that existed. He put himself in a position in which he could anticipate that others would react in some manner such as to cause him injury. The precise form of reaction and injury is not determinative. *Medi-Clean Service, Inc. v. Hill, supra* 241 S.E.2d at 293. *Lewis v. Harry White Ford, Inc.,* 129 Ga.App. 318, 199 S.E.2d 599, 602 (1973). Clay could anticipate reaction. He exposed himself to the risk of it, and it occurred. For proximate cause purposes it matters not that the reaction was a gun carelessly fired by a ranger rather than a billy club carelessly swung, or a rock or other object carelessly thrown by an aroused parent, a vehicle fleeing the scene driven by a frightened parent, or some other of the general types of reactive acts that might reasonably be anticipated. *E.g., Mullis v. Chaika,* 118 Ga.App. 11, 162 S.E.2d 448, 451–52 (1968).

Citing *Johnston v. Pittard,* 62 Ga.App. 550, 8 S.E.2d 717 (1940), the plaintiffs argue that Clay's actions were, as a matter of law, "purely incidental" to his injury. *Johnston,* however, is easily distinguished from this case. There the plaintiff was the unwitting victim of a practical joke and, unlike here, could not reasonably anticipate that his actions would provoke an injury-causing response. The plaintiff approached a house in the country with a group of friends after they had persuaded him that "wild women" were there. In fact the house was occupied by an angered and frightened farmer who fired shots, causing the plaintiff to run, fall, and suffer injury. In contrast, Clay was not victimized by deception. He instead had reason to expect that his actions would arouse anger, fear, reaction by others, and possibly injury of some kind.

■ Additionally, the doctrine of last clear chance does not, as the plaintiffs contend, absolve Clay of any comparative negligence. Under Georgia law, last clear chance applies only if the defendant actually knows of the plaintiff's perilous position. It is insufficient to show merely that the defendant should have known of the plaintiff's peril. *Southland Butane Gas Co. v. Blackwell,* 211 Ga. 665, 670, 88 S.E.2d 6, 10 (1955); *Conner v. Mangum,* 132 Ga.App. 100, 207 S.E.2d 604, 609 (1974). Although Strang should have known that his handling of his weapon and vehicle, which the court found to be negligent, placed Clay in a position of peril, certainly he was not as a matter of law actually aware that such peril existed.

## II. Damages

■ The plaintiffs argue that the district judge's award of damages was inadequate because he (1) deducted Clay's expected income taxes from the award; (2) refused to adjust Clay's estimated future earnings for the effect of inflation; (3) used an excessively high interest rate in discounting the award to present value; and (4) failed to award damages for the period between Clay's death and his expected graduation from high school. Before turning to each of these allegations, we first generally consider whether federal or state law governs.

The FTCA initially directs federal courts to state law: "The United States shall be

liable ... in the same manner and to the same extent as a private individual under like circumstances ...." 28 U.S.C.A. § 2674 (1976). We have accordingly held that "[t]he components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred ...." *Ferrero v. U.S.,* 603 F.2d 510, 512 (5th Cir. 1979). *Accord Simpson v. U.S.,* 322 F.2d 688, 690 (5th Cir. 1963). An important qualification must be added to the general directive to apply state law. The FTCA also states that: "The United States ... shall not be liable ... for punitive damages." 28 U.S.C. § 2674 (1976). The partly punitive nature of the Georgia wrongful death statute, *Atlantic, Valdosta & W. Ry. Co. v. McDilda,* 125 Ga. 468, 54 S.E. 140 (1906); *Savannah Electric Co. v. Bell,* 124 Ga. 663, 53 S.E. 109, 112 (1906), complicates the choice of law issues here. We must refuse to apply punitive aspects of Georgia damage law but, in all other respects, apply Georgia law. *Felder v. U.S.,* 543 F.2d 657, 666 n. 7 (9th Cir. 1976).

### A. Income taxes

Under Georgia law, taxes and other personal expenses of the decedent are not deducted from wrongful death awards. Ga. Code Ann. § 105–1308. We have, however, held that the FTCA's prohibition against punitive damages requires that the personal expenses of the deceased be subtracted from an award of future earnings. *Hartz v. U.S.,* 415 F.2d 259, 264 (5th Cir. 1969). The prohibition would also seem to imply that, like other personal expenses, income taxes must be deducted. Following this logic, we have held that it is appropriate for a trial judge to consider "substantial" tax payments that the deceased would have made on a projected annual income of $65,000.[1] One circuit has gone a step further, holding that, at least with respect to estimated annual incomes above $30,000, income taxes must be deducted from wrongful death awards under the FTCA. *Felder v. U.S., supra* at 670.

A recent Supreme Court decision strongly suggests that ordinarily taxes must be deducted in FTCA suits. In *Norfolk & Western R. Co. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), the Court addressed a closely related issue under the Federal Employers Liability Act, a statute that, like the FTCA, strictly limits recovery to compensatory damages. The Court held that the trial court erred in excluding the impact of federal income taxes on the deceased's expected annual earnings between approximately $12,000 and $17,000, stating: "It is [the deceased's] after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family." *Id.* at 493, 100 S.Ct. at 757. Both logic and precedent persuade us that, to avoid an award of punitive damages, income taxes usually must be deducted from future earnings awarded under the FTCA.

The plaintiffs do not dispute the validity of this general principle. Based on *McWeeney v. New York, New Haven & Hartford, R.R.,* 282 F.2d 34 (2d Cir. 1960) and its progeny, they instead argue that an exception to it exists where the decedent's estimated future earnings are in the low to middle income range. In FELA and maritime cases we have held that the impact of taxes on relatively low incomes is properly withheld from the jury's consideration, reasoning that juries cannot be expected to comprehend and apply the intricacies of federal income tax law accurately. *Johnson v. Penrod Drilling Company,* 510 F.2d 234, 236–37 (5th Cir. 1975) (en banc) (maritime); *Blue v. Western Ry.,* 469 F.2d 487,

---

1. A wrongful death award is not taxable income to the recipient. *See Norfolk & Western R. Co. v. Liepelt,* 444 U.S. 490, 495, 100 S.Ct. 755, 758, 62 L.Ed.2d 689, 695 (1980). This fact has two important consequences. First, the deduction of income taxes that the deceased would have paid will not, in effect, undercompensate the recipient of the award. Second, failure to deduct such taxes has a punitive effect on the government. As one court observed: "By its tortious activity the Government loses the income taxes the decedents would have paid over the years. If the Government were nevertheless required to pay the survivors an amount estimated to equal those lost taxes, it would be doubly sanctioned." *Felder v. U.S., supra* at 670 n. 17.

496 (5th Cir. 1972) (FELA). Unlike some other circuits, however, *Kalavity v. U.S.,* 584 F.2d 809, 812–13 (6th Cir. 1978); *Montellier v. U.S.,* 315 F.2d 180 (2d Cir. 1963), we have not recognized the so-called *McWeeney* exception in bench-trial FTCA cases. *See Hartz v. U.S., supra* (holding that trial judge properly considered taxes on an estimated annual income of $65,000). We decline to do so here.

*Liepelt* casts serious doubt on the continued validity of the *McWeeney* exception, even in jury trial cases. In holding that the jury should have been presented with evidence regarding the effect of taxes, the Court flatly repudiated the basis of the *McWeeney* exception, the fear that the jury will be confused by complex and speculative tax calculations.[2] The Court acknowledged that the tax issue might serve as a basis for "protracted expert testimony and debate" but added that "the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life." 444 U.S. at 494, 100 S.Ct. at 757. *Liepelt* has greatly limited, if not completely overruled, *McWeeney* and its progeny. In FELA and maritime wrongful death suits the jury must be allowed to weigh the effect of income taxes on the decedent's future earnings, except possibly where taxes would have a "de minimis" impact.[3] The message of *Liepelt* is

even clearer in FTCA bench-trial cases where the jury or trier of fact confusion rationale applies with less force, if at all. In such cases the effect of income taxes, like other items of personal expense, must be considered in awarding compensatory damages.[4] We therefore hold that the district court did not err in deducting income taxes from Clay's expected earnings.

### B. Inflation damages

■ The district judge declined to give "effect to any inflation factor, and the probable depreciation in the value of the dollar" because he considered such a factor "too speculative." 485 F.Supp. at 393, 394. Although recognizing that we have held that inflation damages are improper, *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975) (en banc),[5] the plaintiffs argue that after *Liepelt* damage awards of future earnings must account for the effect of inflation.

The plaintiffs' argument regarding the implications of *Liepelt* for our holding in *Penrod* is unavailing here. Both *Liepelt* and *Penrod* arose under federal wrongful death law. In contrast to FELA and maritime statutes, however, the FTCA generally requires federal courts to apply state law in determining the appropriate measure of damages. *Ferrero v. U.S., supra.*

■ Georgia law permits the trier of fact to consider inflationary trends in awarding damages. *Wood v. Andersen,* 145 Ga.App.

---

**2.** "We therefore reject the notion that the introduction of evidence describing a decedent's estimated after-tax earnings is too speculative or complex for a jury." 444 U.S. at 494, 100 S.Ct. at 757.

**3.** In footnote 7 the Court qualified its holding by suggesting that the evidence regarding the decedent's expected income tax liability may be excluded in some cases: "If the impact of future income tax in calculating the award would be de minimis, introduction of the evidence may cause more confusion than its worth. *Cf. Fed. R. Evid.* 403." 444 U.S. at 494 n. 7, 100 S.Ct. at 758 n. 7.

We cannot say that the impact of income taxes is de minimis here. In *Liepelt* the decedent's expected annual income ranged from $11,988 to $16,828.26. Here the trial judge estimated Clay's annual future earnings at

$12,500, a figure within the range controlled by *Liepelt.*

**4.** Because a judge can grasp and apply the intricacies of tax law more easily than a jury, evidence of the effect of taxation arguably will not "cause more confusion than its worth" even where that effect is "de minimis." 444 U.S. at 494 n. 7, 100 S.Ct. at 758 n. 7. We need not, however, decide whether in bench trial cases an exception exists to *Liepelt's* general rule that the effect of taxes must be considered. Such an exception, if recognized, would not apply here. *See note 3 supra.*

**5.** *Penrod* has since been overruled. *Culver v. Slater Boat Co.,* 688 F.2d 280 (5th Cir. 1982) (en banc).

492, 243 S.E.2d 748 (1978); *Jordan v. Fowler,* 104 Ga.App. 824, 123 S.E.2d 334, 336 (1961). A determination regarding impact of inflation is necessarily based on hypothetical economic predictions. Yet Georgia courts have decided that evidence of inflation is not so speculative that the trier of fact can never rationally assess the effect of inflation. This policy decision precludes the trier of fact from refusing to account for inflation because it deems evidence of inflation inherently unreliable. The role of the trier of fact is narrower. It must decide whether, notwithstanding the hypothetical projections that necessarily accompany all predictions of inflationary trends, the proffered evidence of inflation possesses the definiteness and probative force that can reasonably be demanded of such evidence.

Here we are uncertain whether the trial judge complied with Georgia's policy regarding inflation damages. It is not clear whether he found the evidence of inflation "too speculative" as a general matter, a conclusion that conflicts with a decision of law made by Georgia courts, or whether, consistent with Georgia law, he found the evidence more speculative than evidence of inflation can reasonably be expected to be.[6] We accordingly vacate that part of the judgment establishing the amount of damages and vacate the findings relating to the inflation element of damages and remand to the district court for it to determine, and make findings, on whether, considering the uncertainty that inheres in evidence of inflation, the evidence presented in this case has met the standards of probative value that can reasonably be required of such evidence and, if it has, to resolve damages accordingly.

### C. Discount rate

 The trial judge used a 9% rate of interest in discounting his award to present value. A Georgia statute declares: "It

shall be lawful for the trier of fact, the jury or court, as the case may be, in determining the present value of any future earnings, ... to reduce the same to present value upon the basis of interest calculated at five per cent per annum." Ga. Ann. Stat. § 38–217. The plaintiffs argue that the statute is mandatory, requiring the application of a 5% rate of interest, while the government contends that "[t]he statute merely suggests an acceptable option." Brief of the appellee, at 23. Despite the ambiguity of the statute's literal language, the statute's historical background and Georgia cases suggest that the statute is mandatory rather than permissive.

Prior to 1970, when the statute was passed, Georgia courts had consistently discounted awards of future earnings according to a 7% rate of interest. *Kitchens v. Hall,* 116 Ga.App. 41, 156 S.E.2d 920, 922 (1967) (citing the "well-established" rule of 7%). The statute is reasonably read as a mandatory alteration of this established judicial practice. Indeed, the statute would have little meaning if, as the government contends, it merely expresses a possible option. Georgia courts have accordingly construed the statute to require application of a 5% rate of interest. *Piggly-Wiggly Southern, Inc. v. Tucker,* 139 Ga.App. 873, 229 S.E.2d 804, 807 (1976) (rejecting defendant's argument that a 7% figure be used because "since that time the General Assembly has established that a five percent figure be used"); *Miller v. Tuten,* 137 Ga.App. 188, 223 S.E.2d 237, 239 (1976) (court applied 5% rate, citing statute without discussion); *Complaint of Farrell Lines, Inc.,* 389 F.Supp. 194, 199 (S.D. Ga. 1975) (dictum).

We decline to upset the construction that Georgia courts have placed upon the statute and hold that Georgia law requires use of a 5% interest rate in discounting an award of future earnings to present value.

---

6. In support of his decision not to include inflation damages, the district judge cited the principle that the trier of fact is not bound to accept even the undisputed conclusions of expert witnesses. 485 F.Supp. at 393. That principle, however, cannot free the trier of fact from the duty to apply the governing substantive law. If the trial judge reasoned that evidence of inflation is inherently too speculative, his reasoning would clash with Georgia's position that inflation damages can be a proper component of a damage award.

### D. Pre-graduation damages

■ The trial judge based his award on Clay's projected future earnings after he was expected to finish high school and become a member of the full-time workforce. The plaintiffs maintain that damages for the three-year period before Clay was expected to graduate were erroneously excluded from the award. At the outset we must ask whether the plaintiffs' objection is properly presented for review. It is well-settled that, absent plain error, an appellate court will not consider an issue that was not raised below.[7] *Brookhaven Landscape & Grading Co., Inc. v. J.F. Barton Contracting Co.,* 676 F.2d 516, 523 (11th Cir. 1982). *See Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). The plaintiff's complaint, pre-trial motions, proposed findings of fact and law, in-court arguments and evidence, and motion for a new trial omit mention of pre-graduation damages. We therefore hold that the issue of such damages was not preserved for appeal.

### III. Joinder

■ When Janet Harden originally brought this suit, Georgia's statute vested the cause of action for the wrongful death of a child with the decedent's mother. Ga. Code Ann. § 105–1307 (1976). Approximately nine months later the Georgia legislature, as part of a larger effort to eliminate statutory sex discrimination, repealed that code section and vested the cause of action with the "parents, when not divorced." Ga. Code Ann. § 74–108(b). The trial judge, holding that the new statutory provision applied, joined James Harden, Clay's father, under Fed. R. Civ. P. 19(a). We hold that the district court correctly interpreted Georgia law in making James Harden a party to the suit. The Georgia legislature clearly intended that the new code provision apply in proceedings pending on the provision's effective date.[8] Janet Harden's argument that the statute, so construed, violates Georgia's constitutional prohibition against retroactive laws, Ga. Const. Art. I, § 1, ¶ 7, is without merit. Georgia courts have consistently held that the prohibition applies only to retroactive laws affecting vested rights. *Smith v. Abercrombie,* 235 Ga. 741, 749, 221 S.E.2d 802 (1975); *Bullard v. Holman,* 184 Ga. 788, 193 S.E. 586 (1937); *Spengler v. Employers Ins. Co.,* 131 Ga.App. 443, 206 S.E.2d 693 (1974) (before a judicial judgment has been entered legislature can impair rights that are not vested). Under Georgia law, there is no vested right in tort damages. *Kelly v. Hall,* 191 Ga. 470, 12 S.E.2d 881, 883 (Ga. 1941); *Atlanta Newspapers v. Doyal,* 84 Ga.App. 122, 65 S.E.2d 432 (1951). Here the legislature was considerably within its constitutional powers. Rather than abrogating the mother's "right" to tort damages, it merely required

---

7. Although the defendant does not contend that the plaintiff has waived his contention, an appellate court may raise the waiver issue sua sponte. *See U.S. v. Winkle Terra Cotta, Inc.,* 110 F.2d 919, 921–22 (8th Cir. 1940) (holding that an appellate court cannot reach an issue raised for the first time even though both parties expressly agreed to raise it on appeal). The requirement that an issue must be raised below protects two types of interests. First, by permitting the opposing party to introduce evidence and advance legal arguments on the issue, it protects the defendant against prejudice. *Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Second, it gives the trial judge an opportunity to consider the issue and give the appellate court the benefit of his views. *Cf. Colonial Refrigerated Transp., Inc. v. Mitchell,* 403 F.2d 541, 552 (5th Cir. 1968) (discussing purpose of related requirement that a party object to allegedly erroneous findings on rulings made by trial court). It is this second, institutional type of concern in encouraging a full and accurate exploration of issues below, *cf. Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (emphasizing the importance of the trial as a "decisive" and "portentous" event and the desirability of procedural rules designed to free the trial of possible error), that authorizes an appellate court to raise the waiver issue of its own accord.

8. 1979 Ga. Laws 466–98 states: "This Act shall become effective upon its approval by the Governor or upon its becoming law without his approval, *and shall govern all proceedings and actions brought after it takes effect and also all further proceedings in actions then pending.*" (emphasis added).

that the mother share that right with her husband.[9]

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings not inconsistent with this opinion.

**9.** We decide this issue noting that it is not appropriate for certification to Georgia's attorney general under 28 U.S.C. § 2403(b) (1976). *See Cox v. Schweiker,* 684 F.2d 310, 319 (5th Cir. 1982) (Unit B).

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.