Juanita L. LEWIS and Alfred Lewis, as surviving parents of Octavia Wynnette Lewis, a deceased minor, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ.A. No. 87–85–COL.

United States District Court, M.D. Georgia, Columbus Division.

Sept. 1, 1988.

Ben B. Philips of Swearingen, Childs & Philips, P.C., Columbus, Ga., for plaintiffs.

Jack Hood, Asst. U.S. Atty., Macon, Ga., for defendant.

OPINION

ELLIOTT, District Judge.

This is a wrongful death action brought under the provisions of the Federal Tort Claims Act in which the Plaintiffs allege that negligent acts or omissions of government medical personnel at Martin Army Community Hospital, Fort Benning, Georgia, were the proximate cause of the death of their minor daughter. This Court has

**1526**

jurisdiction over the parties and the subject matter, and venue is proper. Trial of the matter was held on June 13–14, 1988, and after considering the evidence and the arguments of counsel the Court now files this opinion in conformity with the requirements of the Federal Rules of Civil Procedure, incorporating herein the Court's findings of fact and conclusions of law which will be readily apparent.

The Plaintiffs' deceased daughter, Octavia Wynette Lewis, was a dependent of her father, who was an active duty member of the United States Army, and as such was entitled to medical care and benefits, and initially it is noted that Octavia was treated *exclusively* by military doctors for all of her health care needs from birth to the time of her death on June 17, 1981, at which time she was 13 years of age, so the "duty" element of the doctor-patient relationship is conclusive in this case.

The specific issue in this case is whether the Defendant, acting by and through its employees, failed to exercise the proper degree of care in not treating the child's premature ventricular ectopic complex (PVC) condition (rapid, irregular heartbeat) which had been conclusively diagnosed in Octavia two years prior to her death by Martin Army Hospital cardiologist, Dr. William Harper, this condition having ultimately caused her death.

In July 1979 Octavia's mother took her to the emergency room at Martin Army Hospital for treatment of what appeared to be flu-like symptoms and a doctor in the emergency room told Mrs. Lewis that her daughter had some irregular heart rhythms probably brought on by a virus and that he was going to put the child in the hospital for observation, which was done.

Dr. Harper's first contact with Octavia as a patient was on July 13, 1979, and he testified "and at the moment I saw her, she was having ventricular extrasystoles (ectopy) and we call them PVC's today." It is clear that he recognized that the child was experiencing a life-threatening situation and his decision was to "try and see if we could suppress the ventricular ectopy" with

the use of an appropriate drug, a number of which were available. In other words, he correctly diagnosed the child's condition and was aware that the proper course was to use anti-arrhythmic drug suppression therapy. However, all of the evidence shows that he initially made two mistakes, even before he eventually made the major and tragically negligent decision to cease any further drug treatment which was the thing that eventually led directly to her death. He chose to use the drug "Norpace" which was a commonly accepted anti-arrhythmic drug for adults but was a "bad choice" for use in a pediatric patient. Second, while the child was on this regimen of Norpace the Holter Monitor diagnostic test (which is an "at home portable electronic device that measures the heart activity") was *misinterpreted* by Dr. Harper as evidencing "heart block" which, if true, meant that the drug was "over-suppressing" the heart. When he saw what he interpreted as "heart block" on the Holter Monitor strip he stopped the use of the drug. Dr. Harper later admitted in his testimony that it was his misinterpretation of what the Holter Monitor showed which led him to stop the use of the drug.

Apparently Dr. Harper was concerned about his own inability to formulate an acceptable plan of treatment in Octavia's case because on August 28, 1979, he wrote to the Chief of Cardiology at Walter Reed Army Medical Center in Washington, D.C. and in his letter he stated:

I am justifiably quite concerned about this young lady. *I feel that some effort should be made to suppress her ventricular ectopy (PVC's) .... I think serious consideration must be lent to the idea of a* permanent pacemaker followed by *aggressive anti-arrhythmic suppression of her ventricular ectopy. The alternative, of course, is benign observation.*

He did not receive any response to the letter and he did not follow up on his request nor did he make any further attempt to suppress Octavia's PVC's even though he at all times recognized the need to do so. It was simply his decision not to

treat the child with any additional anti-arrhythmic drugs. The following questions were propounded to him and he gave the following answers:

Question: "Yet you knew she was in danger of sudden death."

Answer: "Sure."

Question: "But, you did not treat that, did you?"

Answer: "No."

He not only did not follow up on any treatment for the child, he never advised the parents that their daughter was in a life-threatening situation.

Dr. Harper left Martin Army Hospital on April 30, 1980. He does not remember what consideration he gave to Octavia immediately prior to leaving the hospital. He testified that he had no real successor as far as there being a Board Certified Cardiologist coming in and succeeding him. In fact, he said "I don't know who followed me. There was not anybody there when I left." He further testified that he did not go through any change-over procedure with any successor because there was not one.

Octavia was, for all intents and purposes, simply abandoned by Dr. Harper prior to his departure from Martin Army Hospital as it was his own testimony that his "last footprint" in the child's file was an EKG performed on September 13, 1979. This was a test ordered by Dr. Harper but apparently never acted upon by him in any manner.

The record indicates that a Cuban-trained health care provider employed at the hospital, Henry Mayo Rojas, apparently took over as Dr. Harper's successor in the cardiology clinic because he made a note in Octavia's file on June 27, 1980, on the occasion of Octavia's annual visit, that she was "stable" when, in fact, an EKG test done at that time clearly demonstrated that she was still being victimized by PVC's of a multi-focal variety. She was never advised to return to the clinic for any cardiac-related health care after that date, and she died suddenly less than a year later on June 17, 1981, from multi-focal PVC's.

We move to a consideration of the expert medical testimony and an evaluation of the credentials of the experts.

Dr. William K. Harper, the primary treating physician of the deceased, is a graduate of the University of Mississippi Medical School (1973). He is Board Certified in Internal Medicine (1976) and in the subspecialty of Cardiovascular Disease of ABIM (1979). He did not get his board certification in cardiology until June 1979 while on active duty at Martin Army Hospital, one month before he met Octavia Lewis. Dr. Harper practices clinical cardiology. He is in private practice and by his own admission has never treated a pediatric cardiology patient (with the exception of the deceased). From the entire transcript of his testimony the Court is impressed that Dr. Harper is unfamiliar with the distinction between treatment and control of cardiac arrhythmia in pediatric and adult cardiology patients, a distinction emphasized by the other experts.

The Defendant's medical expert, Dr. Wesley Covitz, is Board Certified in Pediatric Cardiology and practices medicine and teaches at The Medical College of Georgia, Augusta, Georgia. He is well regarded by members of his profession as being expert in the field of nuclear radiology in diagnosing children with heart problems, but his primary interest is not in the field of electrophysiology and ventricular arrhythmia in children. In passing it is noted that the Plaintiffs called Dr. Covitz as *their* witness because he testified favorably for Plaintiffs on the standard of care issue.

The Plaintiffs' medical expert was Dr. Paul C. Gillette, who is a Board Certified Pediatric Cardiologist and is recognized universally as being a foremost authority in the specialty of electrophysiology which is a discipline of the study of mechanisms, causes, and treatment of ventricular arrhythmia. The Defendant stipulated that he was such an expert and the Defendant's own expert, Dr. Covitz, who does not specialize in electrophysiology and ventricular arrhythmia in children, testified that he is acquainted with Dr. Gillette and agreed that Gillette was a "nationally-recognized

authority" in the specialty fields of electrophysiology and ventricular arrhythmia in children. Dr. Covitz also testified that he would defer to Dr. Gillette's opinion as to the long-term effectiveness of drug therapy in the treatment of ventricular arrhythmia if Dr. Gillette's opinions were documented.

Dr. Gillette is the author of five books in the specific area of electrophysiology which are used in virtually all of the big medical libraries and in medical schools as textbooks. He was one of a select group of doctors to be chosen to be on the National Institution of Health Task Force on Prevention and Treatment of Cardiovascular Disease in the Young and he was an Examiner in 1979 for the Sub-board Examination of Cardiologists for the American Board of Pediatrics. He practices medicine, does research, and teaches at the South Carolina Children's Heart Center, Medical University of South Carolina, in Charleston, South Carolina. His qualifications are most impressive and it is the Court's view that his testimony in the case is entitled to primary consideration. In the course of his testimony Dr. Gillette stated many times that within a reasonable medical probability had Octavia Lewis been treated appropriately from 1979 to 1981 up until the date of her death that her death would have been prevented and she would have lived a normal life expectancy. He also stated that the failure to treat her appropriately was not within the standard of care required and that this was the proximate cause of her death.

■ Considering the question whether the treatment provided was within the standard of care required, it is not necessary to give primacy to the opinion of Dr. Gillette because Dr. Covitz agrees with Dr. Gillette that the standard was not observed.

Covitz and Gillette agree that Octavia should have been treated as a pediatric patient rather than an adult cardiology patient. They do not necessarily think it was malpractice for Dr. Harper not to refer her to a pediatric cardiologist, but Dr. Covitz testified that Harper "should have been qualified" to treat the child but did not and for this reason violated the standard of care, and it was Gillette's opinion that Harper was not qualified to treat the patient stating, "I think a Board Certified cardiologist should know his limitations—and, if he feels uncomfortable with a particular case (i.e. the letter to Davis of August 28, 1978) then he should have the ability to refer to somebody with more experience in that kind of case."

Dr. Covitz stated that Octavia's ailment could have been treated with a variety of drugs and that Dr. Harper had several choices as to how to proceed. He stated:

"The onset of this arrhythmia placed (Octavia) in significant jeopardy. Evidence exists that suppression therapy can reduce the mortality of patients with complex ventricular ectopy. The failure to adequately suppress this child's arrhythmia resulted in a higher statistical likelihood of developing a lethal arrhythmia.... The *minimal* treatment would be the institution of a second drug after the Norpace was discontinued with outpatient monitoring. ... The statement on benign observation is a very difficult one to justify. As the ultimate result demonstrates, observation was anything but benign."

When Plaintiff's counsel noted that Dr. Covitz had given an opinion in the case that there were areas that he felt could have been done differently by Dr. Harper, he asked Covitz the following question and received the answer indicated:

Question: "Those areas that you consider 'could have been done differently,' I believe it is your opinion today, as in 1985, that those areas were violations of the standard of care insofar as treating this patient, is that correct, doctor?"

Dr. Covitz: "That's correct."

Dr. Covitz who, it will be recalled, was the Defendant's own expert clearly established the negligence in this case from 1979 through 1981 during the following colloquy with Plaintiff's counsel:

Question: "Dr. Covitz, would it be your opinion that, from the time Dr. Harper first saw Octavia and he subsequently

left Martin Army, from that point through the point he left Martin Army to the day she died, that her treatment and follow-up care for her problem she received was in violation of standard of care?

Dr. Covitz: "Yes."

Dr. Gillette testified that the standard of care during the period 1979 to 1981 would have required the suppression of the serious PVC's in Octavia and that there were a number of drugs in addition to Norpace which were available for that purpose and that a competent cardiologist should have known that the drug Dilantin would be the most effective in children in that situation and Dr. Covitz agreed with this opinion, both of them concluding that the failure to use an appropriate drug in Octavia's case was a violation of the standard of care.

In light of all of the evidence presented, and especially taking into consideration the testimony of the medical experts, the Court finds as a matter of fact that this child could have been successfully treated for the suppression of her arrhythmia up until the day she died and that such treatment in reasonable medical probability would have prevented her premature death. This is a clear case of liability on the part of the Defendant.

■ The Plaintiffs are entitled to recover damages for the wrongful death of their child to the extent provided by Georgia law and the measure is the full value of the life of the deceased. This requires that we first consider what the child's life span would have been had she not died prematurely. This is the only area in which Dr. Covitz and Dr. Gillette are in disagreement. Dr. Covitz is of the opinion that even if the arrhythmias had been controlled Octavia would have lived only about 25 years longer, meaning that in his opinion her life would have ended at about age 38. On the other hand, Dr. Gillette is firmly of the opinion that she would have lived a full life expectancy of about 65 years beyond the year 1981. Taking into consideration all of the evidence bearing on this feature, including the child's prior medical history,[1] the Court concludes that in all probability her life span would have ended at about age 50.

■ Having determined the probable life span, we calculate the economic value of the life by using a formula which was approved in *Harden v. United States*, 688 F.2d 1025 (5th Cir.1982), by which we project the lifetime gross earnings, adjusted for inflation and fringe benefits, reduced to present value, and then make deductions for taxes and personal consumption.

To arrive at a base annual income we must consider the characteristics of the child and the education level she probably would have achieved. The evidence shows that the child was an excellent student and very serious about her school work. She was also apparently well regarded by her peers and her teachers. She missed only two days in attendance the entire school term during the year before she died. She made excellent grades and was a religious child. She was a happy child, enjoyed life, and was very outgoing with her friends. Even in early life she had indicated to a counselor at school and to family members that her ambition was to be a medical doctor like her uncle who is a pediatrician. It is clear that this was an unusual minority group family. Several of her relatives attended college. Her grandmother worked in civil service for 34 years and her grandfather, who was retired military, worked in civil service after retirement. These two grandparents were very much interested in Octavia to the extent that they paid premiums on an insurance policy that guaranteed to make college loans to Octavia and her brother upon graduation from high school, and her brother is now a college student. In addition, Octavia's mother, who has been employed for many years at a local bank, had accumulated savings through a profit sharing plan at the bank for the express purpose of sending her

---

1. In 1972 Octavia, then 4 years old, underwent open heart surgery for correction of a congenital heart defect.

children to college. The child's father is retired military and is now employed in local industry. Octavia's uncle, Mrs. Lewis's brother, is a Board Certified Pediatrician and practices medicine in Columbus, Georgia, having graduated from the University of Georgia School of Medicine. Octavia's aunt is a science teacher at a private preparatory school in Columbus, and Octavia had three cousins who are enrolled at the same private school where their mother teaches. Octavia has a cousin, a niece of her father, who attends Xavier University where she is in her second year.

From the above the Court concludes that this child not only would have had the opportunity to attend college, but more than likely would have had the desire and determination to complete college before beginning an employment career.

Having projected a life span of 50 years and having assumed a college education, we next must establish an earnings base since the minor child herself had not generated any income and did not have any employment history, and certain assumptions have to be made so that we can establish the earnings base.

There was evidence introduced in the course of the testimony of an economics expert who testified for the Plaintiffs concerning government statistics about median income earning figures for various segments of the population, in particular black females with college educations. That information is contained in a government document titled, "Money Income of Households, Families, and Persons in the United States," published by the Bureau of the Census in 1985. This publication shows that in 1985 the median income for black females with a college education was $19,-875. Since we are now in the year 1988 that figure must be brought to current value, and using known increases in income for the years 1986 and 1987 and preliminary figures for 1988 the expert testified that the current-day value would be $23,-100, so this brings us to a base income of $23,100 for projections of what Octavia could have earned had she achieved a college education and then lived to age 50.

We begin the projection for the year 1990, at which time she would have been 22 years of age and presumably would have finished college.

The Court has made the assumption that she would receive some increase in income each year and has used a rate of 8% per year which is consistent with the testimony of the economics expert and has also assumed that in connection with her employment she would receive fringe benefits having a value of 10% of the base pay. Consistent with the formula above referred to, the Court has used a discount rate of 5% and has deducted 30% for taxes and 50% for personal consumption and in this manner has arrived at an adjusted annual income of $8,893.50, and has determined the annual present value and the accumulated total through the year 2018, and has determined that the economic value of the life of the deceased, which the Plaintiffs are entitled to recover, is $416,119.92, all as shown on the following table.

| | | BASE INCOME | $23,100.00 | |
| | | INCOME GROWTH | 8 % | |
| | | DISCOUNT RATE | 5 % | |
| | | TAXES | 30 % | |
| | | CONSUMPTION | 50 % | |
| | | FRINGE BENEFITS | 10 % | |

| | | ADJUSTED INCOME | $ 8,893.50 | |
| YEAR | AGE | ADJUSTED INCOME | PRESENT VALUE | ACCUMULATED TOTAL |
|---|---|---|---|---|
| 1990 | 22 | 8,893.50 | $ 9,408.96 | $ 9,408.96 |
| 1991 | 23 | 8,893.50 | 9,677.79 | 19,086.75 |
| 1992 | 24 | 8,893.50 | 9,954.30 | 29,041.05 |
| 1993 | 25 | 8,893.50 | 10,238.70 | 39,279.75 |
| 1994 | 26 | 8,893.50 | 10,531.24 | 49,810.99 |
| 1995 | 27 | 8,893.50 | 10,832.13 | 60,643.12 |
| 1996 | 28 | 8,893.50 | 11,141.62 | 71,784.74 |
| 1997 | 29 | 8,893.50 | 11,459.95 | 83,244.69 |
| 1998 | 30 | 8,893.50 | 11,787.38 | 95,032.07 |
| 1999 | 31 | 8,893.50 | 12,124.16 | 107,156.23 |
| 2000 | 32 | 8,893.50 | 12,470.57 | 119,626.80 |
| 2001 | 33 | 8,893.50 | 12,826.87 | 132,453.67 |
| 2002 | 34 | 8,893.50 | 13,193.35 | 145,647.02 |
| 2003 | 35 | 8,893.50 | 13,570.30 | 159,217.32 |
| 2004 | 36 | 8,893.50 | 13,958.03 | 173,175.35 |
| 2005 | 37 | 8,893.50 | 14,356.83 | 187,532.18 |
| 2006 | 38 | 8,893.50 | 14,767.02 | 202,299.20 |
| 2007 | 39 | 8,893.50 | 15,188.94 | 217,488.14 |
| 2008 | 40 | 8,893.50 | 15,622.91 | 233,111.05 |
| 2009 | 41 | 8,893.50 | 16,069.28 | 249,180.33 |
| 2010 | 42 | 8,893.50 | 16,528.40 | 265,708.73 |
| 2011 | 43 | 8,893.50 | 17,000.64 | 282,709.37 |
| 2012 | 44 | 8,893.50 | 17,486.37 | 300,195.74 |
| 2013 | 45 | 8,893.50 | 17,985.98 | 318,181.72 |
| 2014 | 46 | 8,893.50 | 18,499.87 | 336,681.59 |
| 2015 | 47 | 8,893.50 | 19,028.43 | 355,710.02 |
| 2016 | 48 | 8,893.50 | 19,572.10 | 375,282.12 |
| 2017 | 49 | 8,893.50 | 20,131.31 | 395,413.43 |
| 2018 | 50 | 8,893.50 | 20,706.49 | 416,119.92 |

The Plaintiffs also seek to recover damages for the loss of the services of the child during her minority and the Court finds that although the value of the services is

incapable of exact proof the Plaintiffs have offered sufficient evidence concerning this feature and the Court determines that they are entitled to recover an amount of $10,-000 for this loss.

The evidence shows that the Plaintiffs incurred funeral expenses in the amount of $2,000 in connection with the death of their daughter and they are entitled to be reimbursed for that expense.

Consistent with the foregoing, it is directed that judgment be entered in favor of the Plaintiffs and against the Defendant in the total amount of $428,119.92.

IT IS SO ORDERED.