**Barbara Jo PALMER, Plaintiff-Appellee/**

**Cross–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellant/**

**Cross–Appellee.**

Nos. 96–6411, 96–6412.

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1998.

Decided June 4, 1998.

damages and interest pursuant to the Federal Tort Claims Act (Act). The district court had jurisdiction pursuant to 28 U.S.C. § 1346(b). The government timely appealed and Barbara Palmer individually and as the representative of the estates of her deceased husband and their two children (hereinafter referred to collectively as Palmer) timely cross-appealed, and we have jurisdiction. 28 U.S.C. § 1291.

I

In the underlying tort action, Palmer sued the government, alleging that it negligently released John Bundy, Ms. Palmer's ex-husband, from a Veterans' Administration hospital. Bundy was hospitalized from 1984 to 1989 following an attempted suicide. In 1989, Bundy was released to a home-based residential care center, operated privately by Harold and Ilene Yeager in their personal residence. In February 1990, Bundy moved out of the Yeager house to live independently. On September 3, 1990, he went to the Palmers' home and shot and killed Robert Palmer (Barbara Palmer's husband) and the two Palmer children. Palmer prevailed on her claim that the deaths were proximately caused by the government's negligence. The government does not raise this liability issue on appeal.

Thomas M. Bondy (argued and briefed), Mark B. Stern (briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Defendant–Appellant.

Philip Taliaferro (argued and briefed), Alice G. Keys, Robert W. Carran (briefed), Taliaferro & Mehling, Covington, KY, for Plaintiff–Appellee.

Before: MERRITT, NORRIS, and WALLACE,* Circuit Judges.

WALLACE, Circuit Judge.

In this case, we are asked to review a finding of unethical conduct and accompanying sanctions, as well as determinations on

II

The government appeals from the district court's decision that a Department of Justice (DOJ) attorney, Patricia Reedy, committed misconduct, as well as from the accompanying sanctions. We review determinations of attorney misconduct for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (*Cooter & Gell*). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.*

The district court determined that Reedy breached her ethical duties when she "know-

---

* The Honorable J. Clifford Wallace, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

ingly ... fail[ed] to disclose a material fact ... necessary to avoid a fraud being perpetrated upon the tribunal." *See* Kent. R. Prof. Conduct 3.3(a). This assessment was based on three alleged ethical breaches.

### A.

The first alleged failure to disclose concerned a report Reedy drafted concerning possible document destruction by a government witness. On September 15, 1994, in the course of interviewing witnesses, Reedy was told by Ray Goode, the Veterans' Administration social worker who was responsible for visiting Bundy at the Yeager home, that in 1993 Goode had destroyed a series of weekly notes prepared by Mrs. Yeager pertaining to Bundy. Goode asserted that he had been told to destroy the documents by Assistant United States Attorney Dell Littrell, who was working on this case at that time.

Reedy consulted with her supervisors and was told to obtain additional information. Littrell, in an interview with Reedy on September 22, denied telling Goode to destroy documents. On September 23, Reedy and another DOJ attorney reinterviewed Goode. At that time, he recanted his allegation that Littrell had told him to destroy documents, instead claiming that she told him it would be "better if they were not there." Goode continued to assert that he had indeed destroyed documents, explaining at this point that they were two half-filled pages of handwritten notes by Mrs. Yeager concerning Bundy's complaints about his medications, anger at his family, and anger at the Veterans' Administration. However, Mrs. Yeager, in an interview with DOJ attorneys on September 30, denied making any handwritten notes about Bundy, except a one-page note in 1989 about a meeting discussing plans for Bundy to move out of the Yeager residence.

On October 6, 1994, Reedy summarized the interviews and her impressions in an internal DOJ memorandum. On October 13, she brought the possible document destruction before the court through a motion requesting leave to file a supplemental discovery response. The motion stated that "defendant asks for leave to file its supplemental response in order that it may put on the record that an issue has arisen as to the possible existence of documents created by a non-federal, non-party witness which may be relevant and which may have been misplaced, discarded, or destroyed by government employees." The attached supplemental discovery response further explained:

> On September 15, 1994, Ray Goode, a social worker for the Chillicothe VA, claimed that he had in his possession additional documents authored by Mrs. Yeager that he destroyed after this litigation commenced, claiming that he did so based on his understanding of comments made by AUSA Littrell. An immediate and ongoing inquiry has failed to confirm that Ray Goode destroyed original documents authored by Mrs. Yeager or that he was instructed or advised to destroy or discard any documents.

This motion was granted on November 1, 1994, by the magistrate judge to whom discovery motions had been delegated.

■ The district court held that this disclosure was "intentionally incomplete, evasive, and not made in good faith, although it truthfully stated that Goode had told Ms. Reedy that he had destroyed documents." The question is whether the record properly supports this determination.

■ The district court specifically faulted the disclosure because "[a]t the time th[e] supplemental discovery response was tendered, Goode was adamantly insisting that he had destroyed documents." Reedy's DOJ memorandum did state that Goode was "adamant he believes AUSA Littrell clearly indicated that he should destroy o[r] dispose of the documents." Any perception of how "adamant" Goode was, however, was merely an impression by Reedy. An attorney's subjective impression of a witness cannot be a "material fact ... necessary to avoid a fraud being perpetrated upon the tribunal," which is all that the DOJ was required to disclose. Kent. R. Prof. Conduct 3.3(a).

Indeed, the district court pointed out no material fact that Reedy failed to disclose; nor has Palmer been able to do so. The government's disclosure apprised the court and Palmer of the possible destruction of

documents and Goode's allegation that he was told to destroy the documents by Littrell. Because the district court "based its ruling on ... a clearly erroneous assessment of the evidence," we hold that it abused its discretion in determining the disclosure to be an ethical violation. *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447. The government's prompt and forthright disclosure was appropriate and commendable.

■ The district court also held the disclosure insufficient because "filing a discovery response is not equivalent to bringing a matter to the attention of the court." However, the motion required and received action by the court. If a district judge chooses to delegate discovery motions to a magistrate judge, the district judge cannot fault a party for the magistrate judge's choice not to pass on information to the district judge. The motion for leave to file a supplemental discovery request was an appropriate vehicle to bring the information before the court and Palmer.

### B.

■ The second basis for the district court's award of sanctions was the finding that Reedy breached her ethical duty by her conduct at Goode's deposition:

A further implied misrepresentation was made by Ms. Reedy when, at Goode's deposition of January 5, 1995, she stood by while he stated that he had not "read documents for some months," when she had just gone through the documents with him immediately before his deposition.

This assessment of Reedy's behavior is clearly erroneous because it overlooked Reedy's attempt to interject the distinction between "reading" and "looking" at the documents. After Palmer's counsel initially asked Goode if he had looked at the file in the last week or so, Reedy interrupted: "Just for clarification, when you say 'look'— so there is not any question—look or read, Mr. Taliaferro?" Counsel for Palmer then restated the question as whether Goode had "ever read the information contained in that file."

Since Reedy agreed that she had sorted the files with Goode shortly before the deposition, it would have been improper for her to let Goode state that he had not looked at the file in the last week or so. Because there is no evidence that Goode had *read* the information in the file recently, Reedy's clarification was sufficient to prevent a material misrepresentation. The district court clearly erred when it found that she just "stood by." By basing its finding on "a clearly erroneous assessment of the evidence," the district court abused its discretion in determining Reedy's conduct at the deposition to be an ethical violation. *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447.

### C.

The third ethical breach the district court found was in Reedy's statements in court on September 11, 1995, during a discussion at the final pretrial conference. The district court found that Reedy

was guilty of an unprofessional lack of candor when she stated on September 11th and on other occasions that there was "no evidence" that Goode had ever destroyed documents and that "this is all such a red herring." At that time, Ms. Reedy knew that substantial evidence of destroyed documents was contained in her own report of October 6, 1994.

An examination of the colloquy on Goode's destruction of documents which is at issue is instructive.

THE COURT: [D]id Mr. Goode admit he had destroyed some documents or not?

MS. REEDY: Mr. Goode said what's in that document [the October 1994 disclosure to the court] to me. Based on that, he also testified during his deposition that he was confused. He testified that he did not, that A.U.S.A. Littrell did not tell him to destroy documents and he got confused. During the deposition, over and over and over again I offered and invited Plaintiff's counsel to explore this area with Mr. Goode until he felt comfortable that the Government believed that it was all a matter of confusion and that no documents were destroyed, but to explore this to the extent -

THE COURT: Leaving aside for the moment why anything occurred, did he destroy documents or not?

MS. REEDY: I have no evidence that any documents were destroyed. The United States has no evidence that any documents were destroyed based on its investigation.

. . . .

MS. REEDY: Your Honor, the United States made clear at the deposition of Mr. Goode that any questions that he had other than attorney work product and attorney-client privilege were fair game. To ask Mr. Goode what he did and why he said it, what he said, what he was thinking at that time, why he changed his mind, and that was all open to the extent that the United States did an investigation. And again, your Honor, that's why this is all such a red herring in this case. It's such a red herring that has no merit whatsoever.

THE COURT: Did he ever say he destroyed documents?

MS. REEDY: Yes. And that's why the United States filed that report.

THE COURT: Now he says he didn't?

MS. REEDY: That's right. He says he was confused.

■ The district court faulted Reedy for her statement that she had "no evidence" that any documents were destroyed. Strictly speaking, the district court is correct—she had the evidence of Goode's first statement, which he later recanted. In context, however, Reedy's statement was not materially misleading. In her response to the court immediately prior to her "no evidence" statement, she stated that Goode said "what's in that document," referring to the October 1994 motion, which Palmer's counsel had just handed to the district judge. This motion and accompanying discovery response stated explicitly that Goode claimed to have destroyed documents, as Reedy herself articulated further on in the colloquy.

Our review of Reedy's October 6, 1994, DOJ internal memorandum fails to demonstrate to our satisfaction the "substantial evidence of destroyed documents" to which the district court referred and of which

Reedy was supposedly aware during this colloquy. The memorandum's only evidence of document destruction was Goode's own statements, which he recanted prior to the colloquy at issue. There was apparently no evidence corroborating Goode's first statement.

Because we hold that the district court made clearly erroneous findings of fact, we hold that it abused its discretion in sanctioning Reedy. While Reedy's single statement of "no evidence," taken out of context, may be technically incorrect, we hold that this alone cannot support an award of sanctions. The district court's finding of misconduct and award of sanctions are therefore reversed.

### III

■ The government also argues on appeal that the district court erred in awarding prejudgment interest. Legal interpretations of the Act are reviewed de novo. *Young v. United States,* 71 F.3d 1238, 1241 (6th Cir. 1995) (*Young*). The district court awarded interest from the date of the damage award, February 14, 1996, instead of from the date of the final judgment, August 9, 1996. We have previously held that the Act does not waive sovereign immunity for prejudgment interest. *Kirchgessner v. United States,* 958 F.2d 158, 159 (6th Cir.1992) (*Kirchgessner*). We therefore reverse the award of prejudgment interest and remand for a recalculation of the interest due.

### IV

■ Palmer argues on cross-appeal that the district court erred in computing damages by deducting income tax from future wage estimates. This is also an issue of law we review de novo. *Young,* 71 F.3d at 1241. "Claims under the [Act] entail a two-step analysis. First, the district court applies local law to determine liability and to assess damages. Second, federal law is invoked to bar proscribed recoveries, such as punitive damages." *Kirchgessner,* 958 F.2d at 159.

■ The first question on local damages law is easily resolved. Under Kentucky law, it is inappropriate to consider future

taxes in estimating economic loss. *Paducah Area Public Library v. Terry,* 655 S.W.2d 19, 23–24 (Ky.App.1983).

The second question, whether failure to consider future taxes would be punitive, and thus barred by the Act, is more difficult. Federal law on deduction of future taxes under the Act has primarily been discussed by this court in the context of when "state law is silent or unclear." *Kirchgessner,* 958 F.2d at 160–61, *discussing Kalavity v. United States,* 584 F.2d 809, 812–13 (6th Cir.1978) (*Kalavity* ). Kentucky law, however, is neither silent nor unclear on the issue of deducting future taxes from wage estimates.

Income tax can therefore be deducted from future wage estimates in Act cases applying Kentucky law only if the deduction is required by the Act because failure to deduct would be punitive. 28 U.S.C. § 2674; *Kirchgessner,* 958 F.2d at 159; *Flannery v. United States,* 718 F.2d 108, 110–11 (4th Cir.1983) (*Flannery* ); *Harden v. United States,* 688 F.2d 1025, 1029 (5th Cir. Unit B 1982) (*Harden* ); *Hollinger v. United States,* 651 F.2d 636, 642 (9th Cir.1981) (*Hollinger* ).

While this court has not determined the specific issue of whether inclusion of estimated income tax in future wage estimates is "punitive," it has determined a very similar issue, which we deem controlling. In *Kalavity,* we held that a wrongful death damage award cannot be reduced because the spouse has subsequently remarried and is receiving support from another husband. 584 F.2d at 811. We stated:

> In excluding "punitive" damages from the coverage of the Tort Claims Act, we believe that Congress simply prohibited use of a retributive theory of punishment against the government, not a theory of damages which would exclude all customary damages awarded under traditional tort law principles which mix theories of compensation and deterrence together.

*Id.* Inclusion of future income tax in wage estimates is clearly not motivated by a "retributive theory of punishment." Using the definition of "punitive" established in *Kalavity,* we must reverse the district court's exclusion of estimated future income taxes from the damage award. In so doing, we recog-nize that the district court was following a majority of the courts of appeal that have considered this issue and have determined that inclusion of estimated income taxes is punitive. *Flannery,* 718 F.2d at 111; *Harden,* 688 F.2d at 1029; *Hollinger,* 651 F.2d at 642. *But see Manko v. United States,* 830 F.2d 831, 836 (8th Cir.1987) (deducting income taxes not punitive). We are bound by *Kalavity,* however, and therefore reverse.

The finding of unethical conduct and the imposition of sanctions are REVERSED and damages are VACATED and case REMANDED for entry of interest and damages in accordance with this opinion.