Lynette **CHILDS** and **Larry B. Scott**, as Co–Administrators of the Estate of, and Natural Parents of, Ashley Latrise Scott, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Rosa L. **REESE**, Individually, and as the Parent of Debra Gordon, Deceased, and as the Administratrix of the Estates of Debra Gordon and General Gordon, and for the benefit of the Next of Kin of General Gordon, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Nos. CV 494–252, CV 494–239.

United States District Court,
S.D. Georgia,
Savannah Division.

April 30, 1996.

Jeffrey W. Lasky, Savannah, GA, Childs and Scott for Myra H. Dixon, Atlanta, GA, for Reese.

Lawrence B. Lee, Melissa S. Mundell, Savannah, GA, for defendant.

## MEMORANDUM AND ORDER

NANGLE, District Judge.

Plaintiffs brought the above-captioned actions under the Federal Tort Claims Act seeking recovery for the wrongful death of their decedents. Defendant admitted liability in both cases and the Court consolidated the cases for a bench trial on the question of damages. After considering the evidence adduced at trial, as well as the parties' exhibits, pleadings, stipulations and proposed findings

of fact and conclusions of law, the Court enters the following Findings of Fact and Conclusions of Law. Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. Introduction

On November 10, 1992, Ashley Latrise Scott ("Ashley"), Debra Reese Gordon ("Debra") and her unborn child, General Gordon ("General"), were traveling in Debra's automobile through an intersection in downtown Savannah, Georgia, when a United States Postal Service ("USPS") truck wrongfully entered the intersection and struck Debra's automobile. The force of the collision pushed the automobile head-on into another truck that was sitting at the intersection. Ashley, Debra and General died almost immediately after the collision.

Plaintiffs brought the above-captioned actions against the United States of America ("USA" or "Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., seeking damages for decedents' wrongful death, pain and suffering and funeral and medical expenses. Plaintiffs Childs and Scott, as administrators of Ashley's estate, subsequently withdrew the estate's claim for pain and suffering because they had not properly presented this claim to the United States Postal Service as required by 28 U.S.C. § 2675. The Court, moreover, dismissed the claim of General Gordon's estate for pain and suffering after the Georgia Supreme Court held in *Peters v. Hospital Authority of Elbert County*, 265 Ga. 487, 458 S.E.2d 628 (1995), that there is no cause of action under O.C.G.A. § 51–1–19 for an unborn fetus' personal injury.

With respect to plaintiffs' remaining claims, the Government admitted that it is vicariously liable for the negligent acts of the Government employee operating the USPS truck,[1] and the parties have stipulated that this Court has jurisdiction over these actions pursuant to 28 U.S.C. § 1346, that venue is proper under 28 U.S.C. § 1402(b) and that

plaintiffs had properly presented their remaining claims to the United States Postal Service as required by 28 U.S.C. § 2675. The parties have further stipulated that Ashley's estate is entitled to $5,545.46 for her funeral and medical expenses and that the estates of Debra and General Gordon are entitled to a total of $8,794.00 for funeral and medical expenses, as well as expenses related to the damage done to Debra's vehicle. Remaining for resolution, then, is the question of damages as to plaintiffs' wrongful death claims and as to the claim of Debra Gordon's estate for her pain and suffering.

### II. Background of Decedents

#### A. Ashley Latrise Scott

Ashley was a female born on July 9, 1986. On the date of her death, November 10, 1992, she was approximately 6.3 years old. Ashley was in good physical health and, according to the Mortality Table for 1949, Ultimate,[2] had a life expectancy at the time of her death of 73.19 years.

Ashley's natural mother is plaintiff Lynette D. Childs and her natural father is plaintiff Larry B. Scott. Childs and Scott have never been married to one another and do not live together. Ms. Childs lives in Savannah, Georgia, holds a college degree and is employed as a claims analyst for a major insurance company. Mr. Scott lives in Hardeeville, South Carolina, where he owns an excavation business.

At the time of her death, Ashley lived with her mother in Savannah, Georgia. By all accounts, Ashley and Ms. Childs had a very close relationship and spent a great deal of time together. They regularly attended church in Savannah where Ashley sang in the choir. At home, Ashley was required to contribute to the daily maintenance of the house and to complete her homework before engaging in any other activities. Ashley was also very active in the Girl Scouts. In sum, Ms. Childs provided a home environment for

---

**1.** The Government's admission of liability did not include a waiver of its contention, made in a motion to dismiss, that plaintiff Rosa Reese lacks standing under Georgia law to bring a claim for the wrongful death of General Gordon. By Order entered April 24, 1995, the Court denied the Government's motion to dismiss.

**2.** See O.C.G.A. § 24–4–45 and Appendix.

Ashley that was nurturing, supportive and disciplined.

Although Mr. Scott lived apart from Ashley, the testimony indicated that he was also involved in Ashley's life. Mr. Scott testified that he provided her with financial support; however, his testimony on this point was noticeably vague, he admitted that he did not make regular support payments and he failed to present any documentary evidence (i.e., checks, etc.) to support his claim of financial assistance. Mr. Scott further testified that he frequently visited Ashley in Savannah and occasionally took her back to Hardeeville to be with his family. Ashley and her father also regularly took trips to the beach and to amusement parks such as Six Flags and Walt Disney World.

At the time of her death, Ashley was in the first grade. Ashley's teacher, Margaret H. Parker, testified that Ashley was an exceptional child, both as a student and as a person. On her only quarterly report card, Ms. Parker awarded Ashley an "excellent" in every school subject except arts and science. According to Ms. Parker, Ashley had, during the short time that she was in the first grade, exhibited a level of intellectual ability and behavior that surpassed that of most of the other students in her class. Ashley was in fact described by all witnesses as being mature for her age, intelligent, thoughtful, well-mannered and respectful. Ms. Parker further testified that Ashley did not seem to have the fear and trepidation that most children exhibit when they start first grade. Ashley was voted "Student of the Month" in her first-grade class during the month before she was killed.

Both Childs and Scott testified that they had always planned for Ashley to attend college. Mr. Scott also testified that he had two certificates of deposit at a local bank totaling $16,500.00, which he intended to be Ashley's college fund. The certificates were, however, in Mr. Scott's name only and, again, plaintiffs did not introduce any documentary evidence which would indicate that the certificates were in fact intended for Ashley's benefit.

## B. *Debra and General Gordon*

Debra Gordon was a 33 year-old female who was, at the time of her death, eight months pregnant with General Gordon. Debra was in relatively good physical health and, according to the Mortality Table for 1949, Ultimate, had a life expectancy at the time of her death of 46.80 years. General Gordon, who upon autopsy appeared to be a healthy fetus, had, according to the same table, a life expectancy of 73.18 years.

Debra grew up in a large, close-knit family on a farm in Millen, Georgia. Debra's mother, plaintiff Rosa Reese, and her father, General Reese, were married for 53 years, and Debra was one of eight children. Debra remained extremely close to all of her family, enjoying the counsel, advice, society and companionship of her mother and siblings until the time of her death. Debra was generally regarded as the favorite child in the family and the moving force in assuring that the family remained close.

Debra attended Jenkins County High School in Millen, Georgia, where she was an excellent student. She was on the Student Council, was vice-president of the National Honor Society, was president of the Foreign Language Club and was very active in the Future Business Leaders of America. Debra was also very popular at school.

After graduating from high school, Debra attended college for approximately three years, during which time she studied to become a nurse. Many of Debra's siblings, and almost all of her nieces and nephews, have attended college or have college degrees.

Debra did not, however, attain a nursing degree. Instead, she began working at M & M Foods, a grocery store in Savannah, Georgia, that subsequently became Kroger Foods. Debra worked her way up to produce manager in 1983 and held that position until the time of her death in 1992. She worked at Kroger for a total of 13 years.

Debra was an exceptional employee who took great pride in her work. The Court heard testimony from two of Debra's former superiors at Kroger. Both testified that she was the best produce manager that they had ever worked with, and one of the witnesses

indicated that he had rated Debra's job performance as high as any employee he had ever rated at Kroger. In sum, Debra was an extremely successful produce manager: her department was consistently profitable and she had an excellent relationship with both her co-workers and the store's customers. Both witnesses also indicated that Debra could have advanced into upper management in the company if she had been so inclined.

Debra's personal life centered around church and family. She regularly attended the same church that Ashley and Lynette Childs attended in Savannah. Debra was Ashley's godmother and they had a close relationship. Debra liked people and was extremely outgoing and friendly with the those in her life.

Debra was married for five years but did not have any children from that marriage. In 1985, her husband committed suicide. Thus, at the time of her death, Debra was an unmarried widow living alone in her own home in Savannah, Georgia. She knew that she was going to give birth to a boy out of wedlock and had decided to name the child after her father, General Reese. Debra did not, however, disclose the identity of the father of General to anyone, and General's father remains unknown to this date. Thus, although General clearly would have been the beneficiary of the love, care and companionship of Debra and her family, he was apparently going to be born into a home in which the father would be completely absent.

## III. *Economic Testimony*

The Court heard testimony from three economic experts, each of whom attempted to place an economic value on the loss associated with the decedents' deaths based upon their lost future income, fringe benefits and household services. Robert D. Coston, Ph.D., a Professor of Economics at Georgia Southern University, testified on behalf of plaintiffs Childs and Scott as to the economic loss associated with Ashley's death, while Francis W. Rushing, Ph.D., a Professor of Economics at Georgia State University, testified on behalf of plaintiff Reese as to the economic loss associated with the deaths of Debra and General. For the Government,

David R. Kamerschen, Ph.D., a Professor of Economics at the University of Georgia, testified as to the lost economic value of each of the decedent's lives.

In valuing the decedents' lost future income, all three experts used the following four elements in making their calculations: (1) base-year or entry-level income; (2) income growth rate; (3) worklife expectancy; and (4) discount rate. The base-year income is the decedent's initial actual or projected before-tax income. The income growth rate reflects the fact that the base-year income will grow over time as a result of inflation, productivity gains and progression in one's career. The worklife expectancy is the probable length of time a person would have remained in the workforce, taking into account periods of voluntary and involuntary unemployment. Finally, because income earned in the future is less valuable than income earned today, the discount rate is used to calculate the present value of a decedent's future income loss.

In addition to these elements, Dr. Kamerschen's appraisals include two other elements: personal tax offset and personal expense/consumption offset. These elements simply reflect the fact that some portion of the decedents' income would be lost to the decedent's personal consumption and to income taxes and would not, therefore, be available to the decedents' survivors. Plaintiffs, as set forth below, contend that neither offset is warranted under the FTCA or Georgia law; thus, neither Dr. Coston nor Dr. Rushing included these elements in their appraisals.

In valuing decedents' lost fringe benefits, which include items such as health insurance, pension benefits and social security, each expert simply took a percentage, ranging from 15% to 20%, of the present value of the decedents' lost income. The final element included in some of the experts' appraisals is lost household services, which reflects the fact that the decedents' uncompensated household labor services have been lost. Thus, the experts attempt to place an economic value on the decedents' contributions to a household by first determining the number of hours in a year that the decedents

would have spent doing uncompensated household labor and then multiplying this number by the minimum wage in 1993, which was $4.25 per hour. They grow this figure and then discount it back to present-day value in the same way that they do for decedents' lost income.

Although each expert employed essentially the same appraisal technique, their calculation of the decedents' total economic loss, not surprisingly, varied substantially. Their conclusions are set forth below.

## A. *Ashley Latrise Scott*

In appraising Ashley's lost future income, Dr. Coston assumes, based upon her family background and success in the first grade, that Ashley would have attained a college degree and would have entered the work force as either a health technician or teacher. Based upon this assumption, he projects that Ashley's entry-level income would be $23,-400.00 [3] in 1995 dollars and that her work-life expectancy would be 34.9 years, which assumes that she would have been out of the workforce for 8.1 years and retired at the age of 65.[4]

Dr. Coston applies a growth rate of 6% to $23,400.00 and grows it until the year that she graduates from college and enters the workforce.[5] This yields her projected starting salary. He then grows her projected starting salary at 6% over her expected worklife, which yields her projected lifetime earnings. He then discounts these future cashflows back to present-day value (he chose July 1, 1995) at the statutorily-mandated rate of 5%. *See* O.C.G.A. § 51–12–13. Performing this calculation, Dr. Coston arrives at $1,217,247.34 as the total present-day value of Ashley's lost income.

Dr. Kamerschen, on the other hand, makes no assumptions about the education or career track that Ashley would take. Instead, he projects a base-level before tax income for Ashley of $13,202.00 in 1993, which is a weighted average of the actual historical before-tax income for black females of all education levels in the United States.[6] He performs a similar calculation with respect to Ashley's worklife expectancy. He assumes that she would have entered the workforce at age 20 and would have a worklife expectancy of 28.15 years, which is an average of work-life expectancies for 20–year old black females of all education levels.[7] Dr. Kamerschen thus grows $13,202.00 at the same growth rate used by Dr. Coston—6%[8]—until the year Ashley would have turned 20 and continues to grow the figure over her 28.15–year worklife expectancy. He also uses the same discount rate of 5%[9] to discount these future cashflows back to a present-day value (he chose July 9, 1995) of $470,628.00. Dr.

---

3. Dr. Coston's projection as to Ashley's starting salary is based upon *Occupational Outlook Quarterly*, (Spring 1992) (Plaintiff Childs' Exhibits 28, 35).

4. Dr. Coston's projection as to Ashley's expected worklife is taken from *Worklife Estimates, Effects of Race and Education*, Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics, Table 4, at 5 (U.S. Printing Office February, 1986) (Plaintiffs Childs' Exhibit 25).

5. Dr. Coston assumes Ashley would enter the workforce in the July following her graduation from college.

6. Dr. Kamerschen's source is *Money Income of Households, Families, and Persons in the United States: 1992*, U.S. Bureau of the Census, Current Population Reports, Series P–60, No. 184 (Washington, D.C., U.S. Government Printing Office, 1993).

7. Dr. Kamerschen relies upon the same publication for his worklife expectancies as does Dr. Coston, *Worklife Estimates, Effects of Race and*

*Education*, Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics, (U.S. Printing Office February, 1986), but uses different tables within the publication. Dr. Coston relies upon Table 4 of this publication, while Dr. Kamerschen averages the worklife expectancies in Tables A–5 and A–6, found at pages 19 and 20 of the publication.

8. Both experts employ this judgmental growth rate, indicating that it closely approximates the growth rate in nominal compensation in the nonfarm business sector over the past 30 to 40 years.

9. In addition to using the 5% discount rate required under Georgia law, Dr. Kamerschen also makes an alternative calculation using a rate of 6.9%, which he claims is a more "historically accurate" figure. Dr. Kamerschen performs this alternative calculation for each decedent; however, because 5% is the mandatory rate under Georgia law, the Court will not recite these calculations herein.

Kamerschen then deducts 30% from this figure to account for the effect of personal taxes and then deducts a further 50% from the resulting figure to account for Ashley's personal consumption. Based upon these deductions, he calculates the present value of Ashley's lost net income as $164,720.00.

As to Ashley's lost fringe benefits, Dr. Coston took 20% of the present value of her lost income. He testified that fringe benefits for all occupations average between 15% and 25%, and he simply uses the mid-point of these two figures in arriving at $222,253.76 (20% × $1,217,247.34) as the present day value of Ashley's lost fringe benefits.

Dr. Kamerschen, on the other hand, took only 15% of the present value of Ashley's gross income [10] in appraising her lost fringe benefits. Thus, he calculates her lost fringe benefits as $70,594.00 (15% × $470,628.00).

Finally, Dr. Coston calculates the lost value of Ashley's household services by assuming that she would have rendered 20 hours per week in such services,[11] valuing these hours at the 1993 minimum wage of $4.25 per hour and assuming that she would have rendered these services over her entire life expectancy. He thus estimates Ashley's lost household services for 1993 as $4,420.00, grows this figure at 6% over Ashley's life expectancy and then discounts these future cashflows back to present-day value using the required 5% discount rate. Performing this calculation, he arrives at $289,337.90 as the value of Ashley's lost household services. Dr. Kamerschen does not include this element in his appraisal of Ashley, concluding that lost household services are too speculative to be estimated in the case of a young child.

Thus, the total present economic loss associated with Ashley's death, according to Dr. Coston, is $1,728,839.00, based upon lost income of $1,217,247.34, lost fringe benefits of $222,253.76 and lost household services of $289,337.90. Dr. Kamerschen, on the other hand, calculates her total loss as $235,314.00, based upon lost net income of $164,720.00 and lost fringe benefits of $70,594.00.

**B. *Debra Gordon***

In appraising Debra's lost future income, Dr. Rushing uses her actual income in 1992 on an annualized basis, which is $24,196.00.[12] He then grows this figure at the annual average rate of pay raise that Debra enjoyed at Kroger—5.6%—over her expected worklife, which he assumes is 32 years. This worklife expectancy is based upon his assumption that Debra would have worked without interruption until she retired at age 65.[13] Dr. Rushing then discounts these future cashflows back to present-day value (he chose July 1, 1995) using the 5% discount rate to arrive at $890,139.00 as the present value of her lost future wages.

Likewise, Dr. Kamerschen uses $24,196.00 as Debra's base-year income. He also calculates a growth rate for Debra based upon her earnings history at Kroger; however, his calculation is based upon a geometric average, whereas Dr. Rushing's is based upon an arithmetic average. Thus, Dr. Kamerschen calculates a slightly lower growth rate of 5.41%.

In contrast to Dr. Rushing, Dr. Kamerschen relies upon the worklife tables in arriving at Debra's expected worklife. He assumes a worklife for Debra of 20.99 years, which is the average of (1) an active black female 33.3 years of age (19.09 years); and (2) an active black female 33.3 years of age with 15 or more years of schooling (22.89

---

**10.** "Gross income" denotes income before deduction of taxes or personal consumption, while "net income" denotes income after deduction of taxes and personal consumption.

**11.** Dr. Coston relied upon the *Family Economic Review*, published by The Department of Agriculture, for his assumption that Ashley would render 20 hours per week in household services.

**12.** Debra had actually earned $20,970.09 at the time of her death in November of 1992; thus, Dr.

Rushing simply carried her earnings out for the rest of the year to arrive at $24,196.00.

**13.** Debra was 33 years of age at the time of her death; thus, Dr. Rushing arrives at a 32–year worklife expectancy by subtracting 33 from 65, her assumed age of retirement. Dr. Rushing testified that he did not use the worklife table because Debra's actual work history is a better indicator of her worklife expectancy.

years).[14] He thus grows Debra's income for 20.99 years at 5.41% per year and then discounts these cashflows back to present-day value using the 5% discount rate to arrive at a present value for her lost income of $556,770.00. As he did for Ashley, he then subtracts 30% for taxes and 50% for personal consumption to arrive at $194,870.00 as the present value of her lost net income.

In order to calculate Debra's lost fringe benefits, Dr. Rushing spoke with Kroger representatives to find out what fringe benefits were available to its employees. Based upon these discussions, Dr. Rushing chose 19.6% as the appropriate percentage of Debra's lost future income for calculating her lost fringe benefits. Thus, multiplying $890,139.00 by 19.6%, Dr. Rushing arrives at $174,467.24 as the value of her lost fringe benefits. Dr. Kamerschen, on the other hand, takes 15% of his calculation for Debra's lost gross income—$556,770.00—to arrive at $83,516.00 as the value of Debra's lost fringe benefits.

As to Debra's lost household services, Dr. Rushing assumes that she would have provided such services during the first 18 years of General Gordon's life. Thus, he values Debra's lost household services in the first year of General Gordon's life as $4,618.90, based upon 20.9 hours of such services per week valued at the minimum wage rate of $4.25 per hour. He then grows this figure at 4.3%[15] for a period of 18 years and then discounts these future cashflows back to present value using the 5% discount rate. He thus calculates the present value of Debra's lost household services as $82,088.00.

Dr. Kamerschen agrees that lost household services are properly attributed to Debra for the first 18 years of General's life. He finds the value of her lost household services in the

first year of General's life to be $5,950.50, based upon the assumption that she would have rendered 1,400 hours per year[16] of such services valued at the minimum wage of $4.25 per hour. He grows this yearly figure for 18 years at an annual growth rate of 6.36% and then brings these cashflows back to present-day value using the 5% discount rate to arrive at a total value for her lost household services of $119,757.00.

Thus, the total present economic loss associated with Debra's death, according to Dr. Rushing, is $1,147,694.00, based upon lost future income of $890,139.00, lost fringe benefits of $174,467.24 and lost household services of $82,088.00. Dr. Kamerschen, on the other hand, calculates the total economic loss associated with her death as $398,142.00, based upon lost net income of $194,870.00, lost fringe benefits of $83,516.00 and lost household services of $119,757.00.

### C. *General Gordon*

In appraising General's lost future income, Dr. Rushing assumes, based upon General's family background, that he would have attained either a two-year or four-year college degree. Thus, he calculates General's lost income based upon two different profiles: one based upon two years of college and the other based upon four years. Based upon these profiles, Dr. Rushing estimates the 1992 starting income for a male with an associate degree and a male with a bachelor's degree.[17] He then grows the starting salary for an associate degree holder to the year that General would enter the workforce—2013—at the annual rate of 4.3%. He performs the same calculation for a bachelor degree holder, growing the starting salary

---

14. Dr. Kamerschen again averages the worklife expectancies found in Tables A–5 and A–6 of *Worklife Estimates, Effects of Race and Education*, Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics, at 19–20 (U.S. Printing Office February, 1986).

15. This figure represents Dr. Rushing's calculation of the annual inflation rate in the United States for the period 1950 to 1993.

16. Dr. Kamerschen takes the figure of 1,400 hours per year from William H. Gauger and Kathryn E. Walker, *The Dollar Value of House-

hold Work*, Information Bulletin 60, New York State College of Human Ecology, Cornell University, Ithaca, New York, 1980, Chart 1, at 4–5.

17. Dr. Rushing does not give the precise starting salary figures that he used, indicating only that he relied upon the same source that Dr. Kamerschen relies upon, *Money Income of Households, Families, and Persons in the United States: 1992*, U.S. Bureau of the census, Current Population Reports, Series P–60, No. 184 (Washington, D.C. U.S. Government Printing Office, 1993).

for such a graduate to the year 2015, which is the year that General would have entered the workforce under this scenario. This, according to Dr. Rushing, yields General's starting salary in 2013 with an associate degree, and his starting salary in 2015 with a bachelor's degree. He then continues to grow the associate degree starting income for the worklife expectancy of an associate degree holder, 37.6 years, and the bachelor degree starting income for the worklife expectancy of a bachelor degree holder, 38.3 years.[18] Finally, he discounts these future cashflows back to present-day value using the 5% discount rate. Based upon these calculations, Dr. Rushing concludes that the present-day value of General's lost future income is $1,136,830.00, assuming he would have attained an associate degree, and $1,441,752.00, assuming he would have attained a bachelor degree.

Dr. Kamerschen, on the other hand, performs the same calculation that he did in arriving at Ashley's starting income: he calculates the weighted average of the actual historical before-tax income for black males of all education levels in the United States, which is $16,990.00 in 1993 dollars.[19] Dr. Kamerschen assumes that General would have entered the workforce at age 20 and would have a worklife expectancy of 35.22 years, which is an average of the worklife expectancies for 20–year old black males of all educational levels.[20] Thus, he grows $16,-990.00 until the year General would be 20 years old, and then continues to grow it for 35.22 years, his worklife expectancy. Dr. Kamerschen then discounts these future cashflows back to present value using the 5% discount rate to get $866,710.00 as the present value of General's lost future income. After deducting 30% of this figure for income taxes and a further 50% from the resulting figure to account for General's personal consumption, Dr. Kamerschen arrives at $303,-

349.00 as the present value of General's lost net income.

As to General's lost fringe benefits, Dr. Rushing takes 19.6% of General's lost income, which is $222,819.00 under the associate degree scenario and $282,583.00 under the bachelor degree scenario. Dr. Kamerschen, on the other hand, takes 15% of his estimate of General's lost gross income, $866,710.00, to arrive at $130,007.00 as the lost value of General's fringe benefits. Both experts concluded that lost household services were inappropriate in the case of an unborn child.

Thus, Dr. Rushing's appraisal of the total present economic loss associated with General's death, assuming he would have attained a two-year college degree, is $1,359,649.00, based upon lost future income of $1,136,-830.00 and lost fringe benefits of $222,819.00. Under his assumption that General would have attained a four-year college degree, Dr. Rushing finds the total loss to be $1,724,-335.00, based upon lost future income of $1,441,752.00 and lost fringe benefits of $282,583.00. Dr. Kamerschen, on the other hand, calculates the total economic loss associated with General's death as $433,355.00, based upon lost future net income of $303,-349.00 and lost fringe benefits of $130,007.00.

## IV. Evaluation of the Expert Testimony Before the Court

In evaluating the experts' testimony as to the economic loss associated with the decedents' deaths, the Court is constrained to point out that virtually all hypotheses and projections relating to the decedents' lives are necessarily speculative. No triers of fact, be they jurors or judges, can predict the future. The wisest of sages acknowledge this. All history proves that it is simply not possible to anticipate the vagaries of life.

18. Dr. Rushing indicates that he has taken these worklife expectancies from *Worklife Estimates, Effects of Race and Education,* Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics (1986), though he does not indicate which table he relies upon. Based upon the worklife expectancies he uses, however, it appears that he relied upon Table A–3, at page 14 of the publication.

19. Dr. Kamerschen relies upon the same Census publication that Dr. Rushing relies upon. *See supra* n. 17.

20. Here, Dr. Kamerschen averages the worklife expectancies in Tables A–2 and A–3 of *Worklife Estimates, Effects of Race and Education,* Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics (U.S. Printing Office February, 1986).

Predicting who will live a long and enjoyable life or an unhappy and fretful life, who will suffer from illnesses, both mild and serious, who will have to spend extra time to care for a loved one, who will spend time in the Peace Corps., a kibbutz or other service organization, who will fail and who will succeed and who will either enjoy or suffer through life, is a game for fools.

Genes and luck play a significant role in all of our lives and there is no way to factor such matters into life's equation. Perhaps the horrible accident of November 10, 1992, that brings us together in this case is a most sad, but most apt, example of this. Any one of us who has attended a 40th, or even 50th, reunion of a grade school or high school or college class can attest to the unpredictability of life. Some of the most charismatic and promising of our then colleagues died young, or suffered long illness or suffered through other unfortunate and unhappy events. Others, perhaps even those deemed least likely to succeed, have led rather successful, apparently useful lives. Very few members of the human race in our great country, whether male or female, white or black or yellow, of whatever ethnic composition, escape the unpredictable vagaries of life. Life's cup is both half empty and half full.

Valuing the life of a human being is, then, a profoundly difficult task and is made all the more difficult in these cases by the fact that there is no clear economic loss associated with the deaths of either Ashley or General. Unlike Debra, who had an earnings history and therefore a clear monetary loss when she died, Ashley was a six-year old child with no earnings history, while General was an unborn fetus who not only had no earnings history at the time of his death, but had not even taken his first breath on this earth. Thus, the mathematical precision by which all three experts value the economic loss associated with Ashley's and General's deaths is illusory; there simply is no factual basis for the assumptions that underlie their calculations. As the Georgia Court of Appeals recognized some years ago:

[T]here is not, and cannot be in the very nature of this and other like cases, any evidence from which a jury could mathematically determine the value of the life of the deceased [seven-year old] infant on the basis of either past or future earnings or future earning capacity, and for this reason the question of determining the amount to be awarded is almost entirely within the discretion of the jury . . .

*Collins v. McPherson*, 91 Ga.App. 347, 85 S.E.2d 552, 555 (1954).

Thus, because no one can know what Ashley's or General's educational and occupational achievement would have been, the experts were at liberty to make assumptions consistent with the interests of the party for which they were testifying. Plaintiffs' experts were optimistic in their assumptions about Ashley's and General's schooling, starting salary and expected worklife, while defendant's expert was very conservative in his assumptions about these critical elements. It is not surprising, then, that Dr. Coston's appraisal of the economic loss associated with Ashley's death exceeds Dr. Kamerschen's appraisal by almost $1.5 million, while Dr. Rushing's appraisal of the economic loss associated with General's death exceeds Dr. Kamerschen's appraisal by more than $1 million.[21]

■ Dr. Coston's appraisal of $1,728,-839.00 is premised upon two very optimistic assumptions. The first is that Ashley would have received a four-year college degree and would have a salary and worklife commensurate with this level of education. This is an obviously optimistic assumption given that Ashley had not completed the first grade at the time of her death. Dr. Coston's second optimistic assumption is that Ashley would have rendered $4,420.00 (in 1993 dollars) worth of household services over her entire life expectancy of 73.19 years. It is, in the Court's judgment, most improbable that a six-year old child would render household services of such a substantial value. The Court agrees, moreover, with Drs. Rushing's

21. This remarkable disparity in opinion brings to mind an observation made by the Supreme Court many years ago: "Experience has shown that opposite opinions of persons professing to be experts may be obtained to any amount." *Winans v. New York & E.R. Co.*, 62 U.S. (21 How) 88, 101, 16 L.Ed. 68 (1858).

and Kamerschen's conclusion that lost household services are too speculative to attribute to a young child.

Similarly, Dr. Rushing's appraisal of $1,359,649.00 to $1,724,335.00 as the range of economic loss associated with General's death is premised upon the extremely optimistic assumption that General would have attained either a two- or four-year college degree and would have had a starting salary and worklife commensurate with these levels of education. These assumptions are exceedingly optimistic in light of the fact that absolutely nothing is even known about General's basic personal attributes, not to mention the more subtle qualities that are vital to an individual's success: academic capabilities, work ethic, ability to get along and gain rapport with people, etc.

Turning to Dr. Kamerschen's appraisals of $235,314.00 for Ashley and $433,355.00 for General, the Court would first note that his deduction of 30% of the decedents' lost income to account for their personal taxes and 50% from the resulting figure to account for their personal expenses is contrary to the Court's construction of Georgia law and the FTCA, as more fully explained below. Accordingly, the appropriate figure to look at in Dr. Kamerschen's appraisals is his calculation of decedents' lost gross income, which brings his appraisal of Ashley's economic loss up to $531,222.00 and General's up to $996,717.00.

Dr. Kamerschen attempts to avoid the pitfalls inherent in making specific assumptions by calculating a blended salary and worklife expectancy for Ashley based upon the salaries and worklife expectancies for all black females and for General based upon the salaries and worklife expectancies for all black males. In so doing, however, he arrives at figures that are not consistent with Ashley's and General's respective backgrounds. His projections of Ashley's starting salary and expected worklife are significantly lower than his projections for General,[22] even though Ashley's short personal history clearly indicates that she had an aptitude for school and an ability to gain rapport with people. General, on the other hand, has no personal history and was to be raised in a single-parent home, without knowing his father, by a mother who did not graduate from college.

Finally, there is a question as to the reliability of Dr. Kamerschen's worklife expectancy calculations. The Department of Labor report[23] on which he relies in making his calculations suggests that it is improper to combine worklife expectancies based upon gender and worklife expectancies based upon race, as Dr. Kamerschen does in calculating all of the decedents' blended worklife expectancies. In other words, the author of the report tested for the effect of race and for the effect of gender upon a person's worklife expectancy. She did not, however, test for the combined effect of both race and gender "because the sample is too limited to develop reliable joint probabilities."[24] Thus, Dr. Kamerschen's worklife expectancies are based upon a calculation deemed to be imprudent by the author of the report.

In sum, the appraisals of economic loss associated with Ashley's and General's deaths are little more than speculation by witnesses whose underlying assumptions have been obviously influenced by the interests of the party for whom they have testified. For this reason, the Court will give very limited credibility to the expert testimony on the economic loss associated with Ashley's and General's deaths.

## CONCLUSIONS OF LAW

### I. The Parties' Contentions

Plaintiffs contend that they are entitled, under the FTCA and Georgia's wrongful death statute, to two distinct elements of recovery for the wrongful deaths of Ashley, Debra and General: 1) the tangible, econom-

22. His projection for Ashley's salary of $13,202.00 is $3,788.00 less than the $16,990.00 starting salary he projects for General. Likewise, his projection of Ashley's expected worklife of 28.15 years, is 7.7 years less than the worklife he projects for General.

23. *Worklife Estimates, Effects of Race and Education,* Bulletin 2254, U.S. Dept. of Labor, Bureau of Labor Statistics (U.S. Printing Office February, 1986).

24. *Id.* at 2.

ic value of their lives, as shown by the testimony of their experts; and 2) the intangible, non-economic value of the their lives as shown by the testimony of the decedents' family, friends, co-workers, teachers and ministers.

Plaintiffs further contend that their recovery should not be reduced by either the personal taxes or expenses (i.e. consumption) that decedents would have incurred had they lived. In support of this contention, plaintiffs first point out that Georgia's wrongful death statute specifically provides that the personal expenses of a decedent are not to be considered by the fact finder in arriving at an award. Plaintiffs then argue that, under the Supreme Court's recent interpretation of the FTCA in *Molzof v. United States*, 502 U.S. 301, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992), the FTCA's prohibition against an award of punitive damages can no longer be construed as requiring the deduction of personal taxes or personal expenses.

The Government concedes that an award under the Georgia wrongful death statute may include both economic and non-economic losses. It argues, however, that these two elements are generally viewed as alternative means of assessing damages under the statute, so that where, as here, a purely economic award is sufficient to fully compensate a wrongful death plaintiff, Georgia case law suggests that an award of non-economic losses is not appropriate.

The Government also contends that, under the FTCA, plaintiffs' wrongful death awards must be reduced by the personal expenses and taxes which the decedents would have incurred had they lived. Relying upon a number of decisions which pre-date *Molzof,* [25] the Government asserts that the FTCA's prohibition against an award of punitive damages requires a deduction for personal expenses and taxes to avoid awarding any damages that are not purely compensatory in nature.

## II. *The Federal Tort Claims Act*

The FTCA provides that "[t]he United States shall be liable [for torts committed by its employees while acting within the scope of their employment] in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. *See also* 28 U.S.C. § 2672. Because the United States is liable in the same manner and to the same extent as a private individual, its liability is determined under the laws of the state in which the act or omission giving rise to the cause of action arose, *see Richards v. United States*, 369 U.S. 1, 11–12, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962); *Howell v. United States*, 932 F.2d 915, 917 (11th Cir.1991), which in this case is the State of Georgia.

## III. *Damages Under The Georgia Wrongful Death Statute*

Recovery in Georgia for the wrongful death of an individual is governed by Georgia's wrongful death statute, O.C.G.A. §§ 51–4–1 through 51–4–5. There is no dispute that the right of recovery under this statute for the wrongful death of Ashley resides with her parents, plaintiffs Childs and Scott, and that the right of recovery for the wrongful death of Debra resides with her mother, plaintiff Rosa Reese. *See* O.C.G.A. §§ 19–7–1, 51–4–4. Furthermore, as noted *supra* note 1, the Court ruled in response to the Government's motion to dismiss that, under O.C.G.A. §§ 19–7–1(c) and 51–4–5(a), the right of recovery for General's wrongful death resides with plaintiff Rosa Reese, as the administrator of General Gordon's estate. *See Rosa L. Reese, etc., et al. v. United States of America,* —— F.Supp. —— [1995 WL 865483] (S.D.Ga.1995) (doc. 24).

The Georgia wrongful death statute provides for the recovery of "the full value of the life of the decedent", *see* O.C.G.A. §§ 51–4–2, –3, and –5(a), which is defined as "the full value of the life of the decedent without

---

**25.** The primary case upon which the Government relies is *Harden v. United States*, 688 F.2d 1025 (5th Cir. Unit B 1982). *See also Hartz v. United States*, 415 F.2d 259 (5th Cir.1969); *New-*

*mann v. U.S.*, 938 F.2d 1258 (11th Cir.1991); *Lewis v. United States*, 718 F.Supp. 1525 (M.D.Ga.1988).

deducting for any of the necessary or personal expenses of the decedent had he lived." O.C.G.A. § 51–4–1(1). The Court of Appeals of Georgia has held that the "full value of life" is comprised of two categories of damages:

(1) those items having a proven monetary value, such as lost potential lifetime earnings, income, or services, reduced to present cash value . . . or

(2) lost intangible items whose value cannot be precisely quantified, such as a parent's society, advice, example and counsel as determined by the enlightened conscience of the jury.

*Consolidated Freightways Corp. of Del. v. Futrell,* 201 Ga.App. 233, 410 S.E.2d 751, 752 (1991) (internal quotations and citations omitted).[26]

Seizing upon the court of appeal's use in *Consolidated Freightways* of "or" to separate these two categories of damages, the Government argues that the categories are alternative methods for calculating the full value of life. This contention is, however, refuted by the balance of the court's opinion in that case. After concluding that the jury could consider one of the decedent's receipt of veteran's disability benefits in arriving at the economic loss associated with his death, *Consolidated Freightways,* 410 S.E.2d at 753, the court went on to approve the jury's award for the intangible component of the decedents' lives:

There was evidence upon which the jury could base an award for loss of intangible aspects of the decedents' lives. Testimony was given concerning the character and family circumstances of the decedents, and there was evidence, though scant, of the decedents' relationships with their respective children. In considering this evidence in light of their own experience and knowledge of human affairs, and governed by

their enlightened conscience . . ., we cannot say the jurors' verdict shocks the conscience . . .

*Id.*

The two categories of damages set out by the court of appeals in *Consolidated Freightways* are, therefore, conjunctive components of the full value of a decedent's life. They are not, however, mandatory components:

[W]hile a jury may, depending upon the facts of the case, determine that the full value of [a decedent's] life is the gross sum that he would have earned to the end of his life, had he lived, reduced to its present cash value, "the jury is not bound to find that lifetime earnings reduced to present value is the 'full value of the life of the decedent' but such is an aid only to the jury in making such determination."

*Bulloch Co. Hospital Auth. v. Fowler,* 124 Ga.App. 242, 183 S.E.2d 586, 590 (1971)[27] (quoting *Rhodes v. Baker,* 116 Ga.App. 157, 156 S.E.2d 545, 550 (1967)).[28] The fact-finder is thus vested with discretion in applying these components to the particular facts before it, and this discretion is especially wide in the case of a young child:

[A]s to infants of tender years, it is impossible to give evidence of the pecuniary value of the probable loss, and therefore the question of damages for loss on account of impairment of future earning capacity is left to the sound judgment, experience, and conscience of the jury without any proof thereof whatever . . . "The value to a parent of the services of a minor child is not determinable solely from evidence as to the amount of money the child earns or is capable of earning during its minority. The value of a child's services may be determined from all the evidence, including evidence as to the age and precocity of the child, its earning capacity, and the services rendered by it, the circumstances of the

---

**26.** *Accord Miller v. Jenkins,* 201 Ga.App. 825, 412 S.E.2d 555, 556 (1991); *Jones v. Livingston,* 203 Ga.App. 99, 416 S.E.2d 142, 146–47 (1992); *Miller v. Jenkins,* 201 Ga.App. 825, 412 S.E.2d 555, 556 (1991).

**27.** *Overruled on other grounds by Gilson v. Mitchell,* 131 Ga.App. 321, 205 S.E.2d 421 (1974).

**28.** *Accord Calloway v. Rossman,* 150 Ga.App. 381, 257 S.E.2d 913, 917 (1979); *A–1 Bonding Service, Inc. v. Hunter,* 125 Ga.App. 173, 186 S.E.2d 566, 571 (1971), *affirmed,* 229 Ga. 104, 189 S.E.2d 392 (1972); *City of Macon v. Smith,* 117 Ga.App. 363, 160 S.E.2d 622 (1968); *Collins v. McPherson,* 91 Ga.App. 347, 85 S.E.2d 552, 554–55 (1954).

family and the living conditions, and from experience and knowledge of human affairs on the part of the jury." (citations and internal quotations omitted)

*Collins v. McPherson,* 91 Ga.App. 347, 85 S.E.2d 552, 554 (1954) (*quoting Seaboard Air–Line Ry. Co. v. Sarman,* 38 Ga.App. 637, 144 S.E. 810, 814 (1928)).

 Finally, the Georgia wrongful death statute is clear that the decedent's personal and necessary expenses are not to be considered in assessing the full value of a decedent's life. This mandate has been interpreted to include the decedent's personal income taxes. *See Harden v. U.S.,* 688 F.2d 1025, 1029 (5th Cir. Unit B 1982) ("Under Georgia law, taxes and other personal expenses of the decedent are not deducted from wrongful death awards."); *Consolidated Freightways Corp.,* 410 S.E.2d at 755 (holding that the trial court had not committed reversible error in refusing to instruct the jury that any award it made under Georgia's wrongful death statute would not be subject to income taxes); *Miller v. Jenkins,* 201 Ga.App. 825, 412 S.E.2d 555, 555–56 (1991) (approving Georgia Superior Court pattern jury charge on the "full value of life" which instructs the jury to "consider the *gross* sum [the] deceased would have earned to the end of his life, had he not been killed, reduced to its present cash value in determining the amount of the full value of the life of the deceased." [29]).

It is apparent from the foregoing that Georgia law permits this Court, as the factfinder in these two cases, wide latitude in calculating the "full value" of the lives of Ashley, Debra and General. The Court may consider the economic losses associated with the decedents' deaths, as well as any non-economic, intangible losses that the Court deems relevant in determining the full value of the their lives. Georgia law clearly does not, however, permit consideration of the personal expenses and income taxes that the decedents would have incurred had they lived.

## IV. *The Effect of the FTCA's Prohibition Against Punitive Damages*

 Georgia law notwithstanding, the Government argues that the FTCA's prohibition against "punitive damages" requires the consideration (i.e., deduction) of the decedents' personal expenses and income taxes in making the wrongful death awards in these cases. The Court must, therefore, consider whether the Georgia wrongful death statute's mandate that a decedent's personal expenses and taxes be ignored in arriving at the full value of life, results in an award of "punitive damages", as that term is used in the FTCA.

As previously set forth, the FTCA provides that the United States "shall not be liable for ... punitive damages." 28 U.S.C. § 2674. The former Fifth Circuit has held that this provision requires a court to deduct a decedent's personal expenses and taxes from an award under the Georgia wrongful death statute which is based upon the decedent's lost future earnings. *Harden v. U.S.,* 688 F.2d 1025, 1029 (5th Cir. Unit B 1982).[30] In so holding, the Court reasoned that, because a decedent's personal expenses and taxes would have reduced the income available to her family had she lived, the failure to take these items into account would result in an award which is not strictly compensatory in nature and therefore punitive in effect. *Harden,* 688 F.2d at 1029.[31] Thus, under *Harden,* any damages not awarded as compensation for an actual, provable loss are punitive in effect and therefore barred by § 2674. As previously noted, however, *Harden* pre-dates the Supreme Court's decision in *Molzof v. United States,* 502 U.S. 301, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992).

---

**29.** The jury charge in question is found at *Suggested Pattern Jury Instructions,* Volume I: Civil Cases, Part XI., Charge 9 (Carl Vinson Institute of Gov't, The Univ. of Ga., July, 1991) (emphasis added).

**30.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former

Fifth Circuit handed down prior to the close of business September 30, 1981.

**31.** *See also Newmann v. U.S.,* 938 F.2d 1258, 1264 (11th Cir.1991) (relying upon *Harden* for the proposition that income taxes should usually be deducted in a wrongful death case brought under the FTCA).

*Molzof* involved a suit on behalf of a veteran who had received negligent care in a Veterans' Administration ("V.A.") hospital. As in both of the cases at bar, the Government admitted liability and argued that the prohibition in 28 U.S.C. § 2674 against punitive damages barred the award of any damages that were not strictly compensatory in nature. The district court agreed and refused to award the plaintiff any damages for medical care which duplicated the free care he continued to receive at the V.A. hospital, or for his loss of enjoyment of life. The Court of Appeals affirmed concluding that such an award would be punitive in effect and therefore barred by the FTCA.

The Supreme Court, in a unanimous opinion reversing the Court of Appeals, flatly rejected the Government's argument that damages which are not strictly compensatory in nature are barred by § 2674's prohibition against an award of punitive damages:

> The Government's interpretation of § 2674 appears to be premised on the assumption that the statute provides that the United States "shall be liable only for compensatory damages." But the first clause of § 2674, the provision we are interpreting, does not say that. What it clearly states is that the United States "shall not be liable . . . for punitive damages." The difference is important. *The statutory language suggests that to the extent a plaintiff may be entitled to damages that are not legally considered "punitive damages," but which are for some reason above and beyond ordinary notions of compensation, the United States is liable "in the same manner and to the same extent as a private individual."* The damages in the "gray" zone are not by definition "punitive damages" barred under the [FTCA]. (emphasis added)

*Molzof,* 502 U.S. at 308, 112 S.Ct. at 716. Accordingly, the Court concluded that "§ 2674 bars the recovery only of what are legally considered 'punitive damages' under traditional common-law principles." *Id.* at 312, 112 S.Ct. at 718.

The Supreme Court's opinion in *Molzof* thus could not be any clearer: "Punitive damages" is a term of art which has particular meaning under state law, and any damages that are not technically considered "punitive damages" under the relevant state law are available to a plaintiff proceeding under the FTCA. *Harden's* "punitive in effect" test no longer controls the inquiry under § 2674.

Georgia courts have repeatedly held that "punitive damages" are not available under Georgia's wrongful death statute. *See e.g., Engle v. Finch,* 165 Ga. 131, 139 S.E. 868 (1927); *Truelove v. Wilson,* 159 Ga.App. 906, 285 S.E.2d 556 (1981); *Roescher v. Lehigh Acres Development, Inc.,* 125 Ga.App. 420, 188 S.E.2d 154 (1972).[32] Thus, all of the damages comprehended by the Georgia wrongful death statute are either compensatory in nature or fall into the "gray zone" referred to by the Court in *Molzof.* More specifically, the statute's mandate that the "full value of life" be determined without deducting a decedent's personal expenses and taxes does not result in an award of "punitive damages", as that term is used in 28 U.S.C. § 2674. Accordingly, the Court will not consider the decedents' personal expenses and taxes in determining the full value of their lives.

## V. Conclusions as to the Full Value of the Decedents' Lives

Applying the law to the facts found by this Court, the following are the Court's conclusions as to the full value of Ashley's, Debra's and General's lives, expressed, of course, in monetary terms, the only method of valuation available to the Court.

### A. Ashley Scott

It is apparent that Ashley enjoyed a full life for a six-year old child. She was growing up in a good home; a home which emphasized family, church, school and community. She had an excellent relationship with her mother, father and extended family,

---

**32.** *See also* O.C.G.A. § 51–12–5.1 (defining "punitive damages," and specifying when such an award is appropriate).

as well as her friends at school, at church and at Girl Scouts. She had also shown, during her short life, promise as a student and as a person. On the other hand, Ashley's mother and father never married and do not live together. Thus, no matter how one views her parents' relationship, the inescapable fact is that Ashley was being reared in a single-parent home by a working mother and with her father living a significant distance away in another state. Taking these intangible components of Ashley's life into account, as well as the evidence of the economic loss associated with her death, the Court concludes that the full value of Ashley's life is $1,343,000.00.

## B. *Debra Gordon*

■ Debra, of course, is the decedent about whom the most is known. She had an exceptionally close relationship with all of her family, and she was also very close to her co-workers and friends at church. She also loved her job and was clearly very good at it. Debra's life was not, however, without difficulty. Her husband had committed suicide and she was about to become a single, unmarried mother who, for reasons of her own, disclosed to no one the identity of General's father.

Because Debra had a regular earnings history when she died, there is a clear economic loss associated with her death. Dr. Rushing appraises this loss at $1,147,694.00, while Dr. Kamerschen's appraises it at $760,043.00.[33] The $387,651.00 differential in their appraisals is largely explained by the disparity in their assumptions about Debra's worklife expectancy. Dr. Rushing assumed that Debra would have worked every year of her life until age 65, thus yielding a worklife expectancy of 32 years. Dr. Kamerschen, on the other hand, used a worklife expectancy of 20.99 years, which is a blended worklife expectancy for black females 33.3 years of age.[34]

Dr. Kamerschen's calculation ignores the fact that Debra had worked continuously since she began working for Kroger (M & M Foods), that she was an exceptional employee and that she would be the sole source of support for her child. The Court thus concludes that Dr. Rushing's assumption that Debra would work every year of her life until age 65 is more realistic in this instance. As a single mother she likely would have had no other choice.

As to Debra's lost fringe benefits, the Court concludes that Dr. Rushing's appraisal, though seemingly high, is the better of the two appraisals because the percentage of income that he chose is based upon his discussions with Kroger officials. Finally, as to Debra's lost household services, the Court, on this more speculative item, concludes that both of their appraisals of this loss are too high. Based upon these conclusions as to the economic loss associated with Debra's death, and taking into account the intangible components of Debra's life, the Court concludes that the full value of Debra's life is $1,350,000.00.

## C. *General Gordon*

■ Obviously, one can only speculate as to the kind of person that General would have been, his life having been taken before anyone could know him. It is clear that he would have had a loving, caring mother who would have done her best to provide him with all of the things that he would have needed in life. He also would have had a large and caring family from which he could seek advice, counsel and companionship. He was, on the other hand, facing the disadvantage of being raised by a single, working mother, with no father in the home. Taking these intangible components of General's life into account, as well as the evidence of the economic loss associated with his death, the Court concludes that the full value of General's life is $1,083,000.00.

33. This figure is based upon Dr. Kamerschen's calculation of Debra's lost *gross* income, which is before his deductions for personal expenses and taxes.

34. This calculation is, of course, subject to the criticism set forth above; namely, that it is based upon a combination of worklife expectancies for females and for African Americans, which is a combination that the author of the report cautions against.

## VI. *The Claim of Debra Gordon's Estate for Her Pain and Suffering*

 Under Georgia law, "[p]ain and suffering is a generic name for several types of damages falling under that head, including mental and physical pain and suffering, past, present and future. The measure of damage in such cases is the enlightened conscience of impartial jurors." *Aretz v. U.S.*, 456 F.Supp. 397, 401 (S.D.Ga.1978), *aff'd*, 604 F.2d 417 (5th Cir.1979).

 It is undisputed that Debra died within minutes of the collision. Consequently, any pain and suffering that she might have experienced was momentary and fleeting. Accordingly, the Court concludes that an award of damages for pain and suffering is inappropriate in this case.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law,

IT IS **HEREBY ORDERED** that judgment be entered in favor of plaintiffs Lynette Childs and Larry B. Scott, as Co–Administrators of the Estate of Ashley Latrise Scott, and against defendant, the United States of America, in the amount of $5,545.46 for medical and funeral expenses.

IT IS **FURTHER ORDERED** that judgment be entered in favor of plaintiffs Lynette Childs and Larry B. Scott, as the natural parents of Ashley Latrise Scott, and against defendant, the United States of America, in the amount of $1,343,000.00 for the wrongful death of Ashley Latrise Scott.

IT IS **FURTHER ORDERED** that judgment be entered in favor of plaintiff Rosa L. Reese, as Administratrix of the Estates of Debra Gordon and General Gordon, and against defendant, the United States of America, in the amount of $8,794.00 for decedents' medical and funeral expenses, as well as property damage to Debra's vehicle.

IT IS **FURTHER ORDERED** that judgment be entered in favor of plaintiff Rosa L. Reese, as the parent of Debra Gordon, and against defendant, the United States of America, in the amount of $1,350,000.00 for the wrongful death of Debra Gordon.

IT IS **FURTHER ORDERED** that judgment be entered in favor of plaintiff Rosa L Reese, as the Administratrix of the Estate of General Gordon, and against defendant, the United States of America, in the amount of $1,083,000.00 for the wrongful death of General Gordon.